| | |
|---|---|
| ADAMS COUNTY DISTRICT COURT<br>1100 Judicial Center Dr.<br>Brighton, CO 80601<br><br>**Plaintiff:** Yong Gen Kim, a.k.a. Craig Kim<br><br>v.<br><br>**Defendants:** Adams County School District 14; Karla Loría in her capacity as Superintendent of Schools of the Adams County School District 14; Reneé Lovato in her capacity as President of the Adams County School District 14 Board of Education; Janet Estrada in her capacity as Vice President of the Adams County School District 14 Board of Education; Maria Zubia in her capacity as Secretary of the Adams County School District 14 Board of Education; James Amador in his capacity as Treasurer of the Adams County School District 14 Board of Education; and Luz Molina-Aguayo a.k.a. Lucy Molina in her capacity as Director of the Adams County School District 14 Board of Education. | DATE FILED<br>July 9, 2025 4:35 PM<br>FILING ID: 4769FAED5F946<br>CASE NUMBER: 2025CV31076<br><br><br><br><br><br><br><br>▲COURT USE ONLY▲ |
| **ROBINSON & HENRY, P.C.**<br>Alexander Lowe, Atty. Reg. 36827<br>Nicholas Catalano, Atty. Reg. 53787<br>7555 E. Hampden Ave, Suite 600<br>Denver, CO 80231<br>P: 303-688-0944<br>F: 303-284-2942<br>alexander.lowe@robinsonandhenry.com<br>nicholas.catalano@robinsonandhenry.com<br>*Attorneys for Plaintiff* | Case Number:<br><br>Division: |

## COMPLAINT AND JURY DEMAND

Plaintiff Yong Gen Kim a.k.a. Craig Kim, by and through his attorneys at Robinson & Henry, P.C., hereby submits his Complaint and Jury Demand against the above-named Defendants, stating as follows:

## <u>GENERAL ALLEGATIONS</u>

1.    This case concerns an egregious violation of Plaintiff Craig Kim's constitutional rights by the Defendants. Mr. Kim exercised his rights under the First Amendment to the U.S.

Constitution, including his freedom of speech, freedom of assembly, and his freedom to petition the government for a redress of grievances—rights that are essential to a functioning democracy. In exercising his constitutional rights, Mr. Kim was critical of certain decisions made by the Adams County School District 14 Board of Education ("the Board"), including the Board's decision to hire Tiffany Narcisse as a new school principal. In doing so, Mr. Kim was exercising his right to engage in political speech. The Defendants responded by engaging in a conspiracy to defame and retaliate against Mr. Kim, culminating in the Defendants banning Mr. Kim from district property. The Defendants retaliated against Mr. Kim because he had the gall to criticize them and to question the Board's hiring of Ms. Narcisse, which Mr. Kim unquestionably had the right to do under the First Amendment. Furthermore, the Defendants even treated Mr. Kim differently based on his race and sex, in violation of the Fourteenth Amendment Equal Protection Clause. Mr. Kim therefore brings this action to vindicate his constitutional rights, seeking both injunctive relief and damages.

2. Mr. Kim is a resident of Adams County and a city councilman for Commerce City. Mr. Kim brings this action in his personal capacity.

3. Defendant Adams County School District 14 is a school district located in Adams County.

4. Defendant Dr. Karla Loría is the current Superintendent of Schools of the Adams County School District 14.

5. Defendant Reneé Lovato is a current member of the Board as the President of the Adams County School District 14 Board of Education.

6. Defendant Janet Estrada is a current member of the Board as the Vice President of the Adams County School District 14 Board of Education.

7. Defendant Maria Zubia is a current member of the Board as the Secretary of the Adams County School District 14 Board of Education.

8. Defendant James Amador is a current member of the Board as the Treasurer of the Adams County School District 14 Board of Education.

9. Defendant Luz Molina-Aguayo a.k.a. Lucy Molina is a current member of the Board as the Director of the Adams County School District 14 Board of Education.

10. This Court has subject matter jurisdiction pursuant to Article 6, Section 9 of the Colorado Constitution. This Court has personal jurisdiction over the Defendants pursuant to C.R.S. § 13-1-124(1)(b).

11. Venue is proper in this Court pursuant to C.R.C.P. 98(c)(5), because tortious acts described herein were committed in Adams County.

### *The April 12, 2025, Email*

12.     On April 12, 2025, Mr. Kim sent an email to the Board and to Defendant Dr. Karla Loría regarding the Board's decision to hire Ms. Narcisse as the new Adams 14 Junior High School Principal.  The April 12 email is attached hereto as **Exhibit 1** and fully incorporated herein.

13.     Aside from using the "Ms." prefix, Mr. Kim's email made no reference whatsoever to Ms. Narcisse's race, sex, gender, or any other personal trait.  Nor did Mr. Kim's email contain any racist, sexist, or otherwise derogatory remarks about Mr. Narcisse.

14.     The April 12 email contained publicly available information about a prior incident involving Ms. Narcisse following the death of one of her students during her previous employment at Justice High School in Fairfax County, Virginia.

15.     The prior incident was in the news and trended on social media.  One outlet publicly reported the following information about the incident:[1]

> [Ms. Narcisse] published a smiling selfie on Twitter, stating "Losing a student is never easy for a building principal.  Still smiling.  Still standing.  Still leading.  Still teaching, learning, and growing."   Many in the Justice community expressed outrage that Narcisse seemed to make that tragedy all about herself.
> . . . .
> A petition seeking the removal of Narcisse drew this comment: "She is self-centered, egotistical, and insensitive.  A child died, and she uses the situation to say how great she is."
>
> According to a Justice parent, students taped multiple copies of the tweet on the school's walls.

16.     Regarding this prior incident, Mr. Kim reserved judgment in his April 12 email, stating only that:

> I discovered reports regarding a tragic incident involving a 10th-grade student, Madeline Valeria Moran Centeno, who sadly overdosed in December 2023. This situation ignited considerable controversy among parents and educators in Fairfax County, drawing attention to the school environment during Ms. Narcisse's leadership following a social media post she made days after.
>
> 1st Link: https://annandaletoday.com/the-search-is-on-for-a-new-principal-at-justice-high-school/
>
> 2nd Link: https://www.sportskeeda.com/pop-culture/news-she-really-lived-name-justice-high-school-principal-tiffany-narcisse-slammed-insensitive-response-student-death

---

[1] https://annandaletoday.com/the-search-is-on-for-a-new-principal-at-justice-high-school/

17.     In his April 12 email, Mr. Kim also voiced concerns about a Business Process Audit that was conducted on Justice High School in April 2022.  At no point in the email, however, did Mr. Kim accuse Ms. Narcisse of any financial misconduct.  Rather, Mr. Kim merely stated that the audit identified various areas of concern that warrant further discussion.

18.     Mr. Kim did not make any false statements about Ms. Narcisse in referencing the 2022 Business Process Audit.  Nor did Mr. Kim make any false statements about Ms. Narcisse in referencing the prior incident that had been in the news and had trended on social media.

19.     Mr. Kim concluded his April 12 email by stating that he would be sharing the information contained in his email with the Adams 14 District Accountability Committee ("DAC") and with other residents to ensure transparency and accountability to the community.

20.     On April 15, 2025, Mr. Kim shared the email he had sent to the Board and Dr. Loría on social media.  Mr. Kim did so, just as he stated he would in his email, to increase accountability and transparency.  The Board clearly did not like that.

21.     In sharing the April 12 email on social media, Mr. Kim again did not make any reference whatsoever to Ms. Narcisse's race, sex, gender, or any other personal trait.  Nor did Mr. Kim make any racist, sexist, or otherwise derogatory remarks about Mr. Narcisse or accuse her of any financial misconduct.

22.     After Mr. Kim shared the April 12 email on social media, a member of the Board, Defendant Luz Molina-Aguayo a.k.a. Lucy Molina, began harassing Mr. Kim on social media and via text message.

23.     Far from addressing Mr. Kim's concerns with professionalism as a member of the Board, as shown in the excerpts below, Ms. Molina resorted to name calling, such as by calling Mr. Kim "machista" and "vato," and falsely accusing Mr. Kim of being sexist and racist against women of color.



**Posts**

**Lucy Molina**
🏆 All-star contributor                                    · **Follow**

**Reneé Lovato** I don't understand why ENTITLED MEN are ALWAYS attacking women of color, but if this was different person surely nada que ver 🫤 disappointing

1d    Like    Reply                                    4 😆😮😲

**Craig Kim** ✏ Author 🏆

**Lucy Molina** you're making this about race and gender and not about ethics based on evidence? I've received quite the feedback from my folks in Fairfax County.

1d    Like    Reply                                    4 👍😆

**Tiffany Marie Dixon**
Facts or attack? Looking out for our children and their future has nothing to do with race!

1d    Like    Reply                                    4 ❤️👍😆

🫧 **Lucy Molina** Tiffany Marie Dixon there's NO h...

View 1 more reply...

**Justin Hall**
**Lucy Molina** it's sad that someone with the influence and position such as yourself, that this is the first place you go when information is being given. Race and gender have nothing to do with it. Do better and stop baiting for no reason.

15h    Like    Reply                                    7 👍❤️😆

5

--- Tuesday, Apr 15, 2025 ---

 **Lucy Molina**

That's pretty Fd up and DISRESPECTFUL Kim😢🤬 not a gentleman at ALL amigo, que lastimo Contigo vato

6:07 PM

Read

**Me**

I don't see how fucked up that is Lucy because I even brought it to your attention and you gave two shits about it. I'm all about accountability and that's exactly what I did by sending you and the rest of that board along with the superintendent that email questioning the decision made.

6:08 PM

Read

**Me**

Like I said it's not against you guys at all it's just about making sure that the rest of the community including you guys were aware of it. We are a disproportionate impacted community and to have someone like her in the position where there has been issues at her previous school, it's not a good look for our community

6:09 PM

Read

 **Lucy Molina**

You absolutely WRONG vato

6:10 PM

Read

**Me**

I don't see how my proof that I shared with you, the board, and the superintendent is wrong. You cannot go against facts.

6:10 PM

Read

6

**Lucy Molina**
Machistas ALWAYS picking on women
6:11 PM
Read

**Me**
So you're going to attack me because I am bringing it up actual facts? That is fucked up Lucy
6:11 PM
Read

**Lucy Molina**
that's Soo manly
6:11 PM
Read

**Lucy Molina**
Too bad
6:12 PM
Read

**Lucy Molina**
😵
6:12 PM
Read

**Me**
So now you're going to bring up it's a masculinity thing. Dude, this is not about gender like you are trying to make this out to be. This is about what is right and what is wrong. It's about ethics it's not about someone's race gender it's just strictly about their experience
6:12 PM
Read

**Lucy Molina**
So disrespectful
6:12 PM
Read



***The April 16, 2025, DAC Meeting***

24.　　The next day, on April 16, 2025, Mr. Kim and Ms. Molina attended an Adams 14 DAC meeting.

25.　　During the DAC meeting, Ms. Molina recorded and live streamed video of herself in which she is seen repeatedly berating Mr. Kim, who was minding his own business and not even speaking to her.  During the video, Ms. Molina is seen again accusing Mr. Kim of racism and sexism.[2]

_____

[2] Ms. Molina subsequently deleted the video from her social media profile, but the video has been preserved by Mr. Kim if the Court is inclined to view the video.

26.     The DAC meeting began with introductions from those in attendance.  When it was Ms. Molina's turn to introduce herself, and while still recording and live streaming, she baselessly accused Mr. Kim of verbally and even physically attacking her and other women of color, and Ms. Molina threatened to call the police unless Mr. Kim left the meeting.

27.     Mr. Kim did not verbally or physically attack anyone.[3]  Ms. Molina's accusations to the contrary were knowingly false and performative.

28.     Nevertheless, Mr. Kim graciously left the DAC meeting so that Ms. Molina might stop causing a disruption.  Although Mr. Kim left the DAC meeting without being escorted out, under the circumstances, he was forced to leave the meeting.

29.     To the extent Ms. Molina was acting in her capacity as a Board member or as an agent of the Board during the April 16 DAC meeting, Ms. Molina and the Board violated the First Amendment to the U.S. Constitution by forcing Mr. Kim to leave the DAC meeting based on Ms. Molina's false and pretextual accusations of Mr. Kim physically attacking her and other women of color and threatening to call the police.  Ms. Molina knew her accusations against Mr. Kim were false, but she made them anyway in order to prevent Mr. Kim from exercising his First Amendment rights at the DAC meeting, including his freedom of speech, his freedom of assembly, and his freedom to petition the government for a redress of grievances.

30.     To the extent Ms. Molina was acting in her capacity as a Board member or as an agent of the Board during the April 16 DAC meeting, Ms. Molina and the Board also violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, because they conditioned Mr. Kim's exercise of his First Amendment rights on his race and sex.  In light of Ms. Molina's statements prior to and during the DAC meeting falsely accusing Mr. Kim of being sexist and racist against women of color, such as by referring to Mr. Kim as an "entitled man" and a "machista," it is clear that Ms. Molina would not have falsely accused Mr. Kim of physical violence and threatened to call the police to force him to leave the DAC meeting had Mr. Kim himself been a woman of color.  In short, Ms. Molina and the Board treated Mr. Kim differently because he is not a woman of color.

### *Defendants' Decisions to Ban Mr. Kim from District Property*

31.     On or around April 19, 2025, chief legal counsel for the Adams County School District 14, Joseph Salazar, sent a threatening letter to Mr. Kim.  The April 19 letter is attached hereto as **Exhibit 2** and fully incorporated herein.

32.     In the April 19 letter, Mr. Salazar accused Mr. Kim of spreading misinformation about the 2022 Business Process Audit that Mr. Kim previously referenced in his April 12 email, and Mr. Salazar attempted to provide some context around the audit.

---

[3] Mr. Kim has sent a Notice of Claim Letter to counsel for the Defendants pursuant to C.R.S. § 24-10-109.  Upon expiration of the waiting period required under the statute, Mr. Kim will seek leave to file an amended complaint with additional claims of defamation.

33.     The Board could have transparently addressed Mr. Kim's concerns by simply sharing with the community the same context Mr. Salazar provided in his April 19 letter, which is contemplated by the First Amendment's purpose of fostering a "marketplace of ideas."  In other words, if the Defendants thought Mr. Kim's statements were incorrect or out of context, they could have simply said so and offered a public explanation.

34.     Instead, Mr. Salazar, as an agent of the Defendants, threatened Mr. Kim with a ban from district property for having the gall to even bring up a subject for debate.  Specifically, Mr. Salazar threatened Mr. Kim with a retaliatory ban from district property if Mr. Kim continued to express views that were critical of the Board and of Ms. Narcisse's qualifications.

35.     And the Defendants made good on their threat.  On or around April 28, 2025, Defendant Dr. Karla Loría, the Superintendent of Schools for the Adams County School District 14, sent a letter to Mr. Kim stating that he had been banned from district property for a period of three (3) years.  The April 28 letter is attached hereto as **Exhibit 3** and fully incorporated herein.

36.     The April 28 letter to Mr. Kim states in part:

We also reviewed your [April 12] email to the Adams 14 Board of Education, which contains misstatements about our newly hired principal, who happens to be a Black woman, concerning her prior employment.  We further considered your campaign to elicit the help of the Chair of the District Accountability Committee ("DAC") to spread this misinformation about our principal.  As recently as Monday, April 21, 2025, other community members joined with you to continue the public spread of misinformation.  In sum, you have targeted a Black female principal through a campaign of misinformation, which has resulted in harm to her reputation and is affecting her ability to lead the District's brand-new junior high school.

37.     The Black female principal referenced in the April 28 letter is Tiffany Narcisse.  However, as explained above and plainly evident from **Exhibit 1**, Mr. Kim's April 12 email made no reference whatsoever to Ms. Narcisse's race, sex, gender, or any other personal trait.  Nor did Mr. Kim's email contain any racist, sexist, or otherwise derogatory remarks about Mr. Narcisse.

38.     Thus, it is apparent from the April 28 letter's reference to Ms. Narcisse's race and sex that the Defendants are using Ms. Narcisse's race and sex as a pretext to silence valid criticism of Ms. Narcisse and of the Board's decision to hire her.

39.     Furthermore, as explained above, Mr. Kim did not make any false statements about Ms. Narcisse in referencing the 2022 Business Process Audit.  Nor did Mr. Kim make any false statements about Ms. Narcisse in referencing the prior incident that had been in the news and had trended on social media.

40.     Nevertheless, in the April 28 letter, the Defendants explicitly referenced false accusations of Mr. Kim spreading misinformation about Ms. Narcisse as a basis for banning Mr. Kim from district property.

41.    Even if what Mr. Kim said was false (it is not), the Defendants banned Mr. Kim from district property based on the content of his political speech, including his viewpoint, which is a flagrant violation of the First Amendment.

42.    Moreover, the April 28 letter states that the Defendants "considered [Mr. Kim's] campaign to elicit the help of the Chair of the District Accountability Committee ("DAC") to spread this misinformation about [Ms. Narcisse]."  In other words, the Defendants are punishing Mr. Kim for availing himself of meeting with the DAC Chair to discuss his concerns, which are flagrant violations of Mr. Kim's freedom of speech, his freedom of assembly, and his freedom to petition the government for a redress of grievances.

43.    Rather than publicly debate the merits of Mr. Kim's concerns, the Defendants sought to silence dissent by banning Mr. Kim from district property.

44.    The April 28 letter also referenced a "physical confrontation" between Mr. Kim and Ms. Molina at the April 16 DAC meeting as a basis for banning Mr. Kim from district property. But no such "physical confrontation" took place—Ms. Molina just made it up.

45.    After receiving the April 28 letter, Mr. Kim submitted a written appeal letter to the Board, urging the Board to reverse the decision banning him from district property.  The appeal letter is attached hereto as **Exhibit 4** and fully incorporated herein.

46.    In the appeal letter, Mr. Kim through undersigned counsel outlined many of the same allegations contained in this Complaint, including that the Defendants' actions described herein violated his constitutional rights.

47.    Furthermore, the appeal letter and its enclosures contained written statements from several people who were present at the April 16 DAC meeting.  As shown in the excerpts below, the witness statements made it abundantly clear that no physical altercation took place and that Ms. Molina was the aggressor and agitator at the meeting.

One parent of a district student said:

> From where I was sitting in the meeting room I was facing the door that Craig Kim entered into the room. I noticed him in the hallway speaking with some older kids and he seemed to be in a positive upbeat mood. The very second, he entered the meeting room Lucy Molina begin to raise her voice and made a statement, here comes that white man[4] that likes to go around attacking women of color. I heard Craig respond with something like that was not the reason he was at this meeting and not the place for this discussion. She continued to be loud and say things like how entitled white men can hate on women of color. Craig sat down and was ignoring her ridiculous outburst and speaking with a couple of the high school girls that were also attending the meeting. In my opinion the more Craig tried to ignore Lucy the louder she thought she needed to be. Making derogatory statements in

---

[4] Mr. Kim is not white.

Spanish and even referring to him as a "vato". I heard her mention that she was either going live or maybe she was already live and continued with the derogatory statements in Spanish. I feel the meeting continued to proceed in its best efforts not to feed into the ridiculous behavior being caused by Lucy Molina. The meeting was moving forward with its ice breaker of introductions. When it was time for Lucy's turn her tone became very aggressive and she started saying she was feeling threatened by Craig Kim. I was so confused as to me she seemed to be the one acting as the aggressor. She accused him of attacking women of color in the city and requested he be removed from the meeting. Even making remarks as to calling the police. I feel that Lucy Molina used her position as a school board member to bully and threaten Craig Kim. I also feel that she falsely used certain verbiage to continue her attack against Craig Kim. If I am being completely honest Lucy Molina's behavior was making me feel very unsafe. She was coming across very confrontational and telling her "live" audience to come on down to the DAC meeting. She made me feel like she was trying to cause more bull[y]ing [sic] and even create physical altercations. Craig Kim handled himself in a respectful professional manor. Whereas Lucy Molina left me with an impression of someone who takes pride in adult bullying.

The Chair of the DAC had the following to say:

On April 16, 2025 we had our Adams 14 District Accountability Committee annual retreat held at the Eagle Point Rec center.

I was talking to Lucy Molina about an email that I wrote to the Adams 14 School Board and district leadership concerning the new hire of a Middle School Principal. When Craig Kim walked in carrying a notebook. When Lucy told him to sit down forcefully and Craig said I'm not doing this tonight, and left the room where Lucy was getting verbally aggressive Craig walked back in and Lucy started yelling that he is racist and how dare he try to hold a women of color back! Craig again repeated he was not going to have this conversation at the DAC. Where Lucy continued to tell him he was racist against women of color. Craig then firmly spoke over her yelling and pointed at Lucy and told her I am not doing this in front of children and walked out of the room again. My oldest child [] walked out after him and was asking him if he was okay.

I started the meeting at 6:10pm 10 minutes late because of this confrontation. I did my opening greeting introduced Who I was and then get an icebreaker, the icebreaker was to introduce yourself and something that you are that begins with the first letter of your name, there were three women that went before Craig Kim and then Lucy Molina was next where she at this time was recording the meeting. Which several people told Lucy they were not comfortable with her recording them and did not have there [sic] permission. I did not realize that she had already been recording until I went back and seen the videos that were later posted. Live streamed online. and Lucy Molina started with explaining who she was that she was an Adams 14 board member that she was there as a board member and that she

felt physically threatened by Craig Kim just being in the room *and that he had assaulted her which did not happen* and proceeded to continue going, Craig was not responding. I was looking at the district leadership in the room to see how to proceed with handling the situation which then proceeded to get out of hand. Lucy Molina then proceeded to start yelling at the parents in the room, saying racist things to them screaming how Craig Kim is yelling at her like a white man And that he is a threat to women of color and threatening Her in front of her kids and my kids as well. My two daughters [] age 15 and [] age 12 ended up having a anxiety attack and PTSD. [My 15 year old daughter] was plugging her ears and rocking herself while this confrontation was going on until she signed to me that she needed to leave the room which then I told her to go And the fighting continued. Lucy was threatening Craig if he didn't leave she would call the cops on him. I tried several times to get the meeting back on track unsuccessfully after Lucy was fighting with other parents that I yelled for everyone to stop. And take a minute to calm down. At this point Craig said out of respect for the kids and the other members he would leave.. so Craig Kim left the meeting. But it did not stop there. The conflict continued with Lucy making statements about being bullied by Craig and then later continued her tirade on Facebook. Which I do that screenshots [sic] of the facebook interaction as well as the emails I sent and the letter I received from the school attorney as well as the videos that Lucy Molina live streamed from the meeting. After the meeting and I seen the video I realized Lucy was recording my Two girls speaking with Craig Kim while she was saying he was a threat to women of color (which for context my girls are Native American) Also on the video several times she made comments about White women while pointing the camera towards members of the DAC. She also told several people where her location was that her gente should come down. Several people who were in the room had come to me during the confrontation and after saying how they felt threatened by Lucy Molina's actions.

(Emphasis supplied).

48.     After receiving Mr. Kim's appeal letter, the Board doubled down on violating his constitutional rights in its May 19 order disposing of his appeal. The May 19 order is attached hereto as **Exhibit 5** and fully incorporated herein.

49.     The May 19 order modified the ban against Mr. Kim by now restricting Mr. Kim from contacting Ms. Narcisse and from accessing the grounds of the new junior high school where Ms. Narcisse is principal for a period of three (3) years.

50.     Note that, even before the May 19 order, Mr. Kim had never communicated with or tried to contact Ms. Narcisse even once. This indicates that the Board's repeated references in the May 19 order to Mr. Kim bullying or harassing Ms. Narcisse are false and pretextual.

51.     The only purported "bullying" and "harassing" of Ms. Narcisse that the Board refers to in the May 19 order is Mr. Kim exercising his political speech rights in his April 12 email questioning Ms. Narcisse's qualifications. Again, that email made no reference whatsoever to Ms.

Narcisse's race, sex, gender, or any other personal trait, and Mr. Kim's email did not contain any racist, sexist, or otherwise derogatory remarks about Mr. Narcisse. The Board's accusations in its May 19 order that Mr. Kim's actions were motivated by race or sex are false and pretextual.

52.    It is again apparent from the May 19 order's reference to Ms. Narcisse's race and sex that the Defendants are using Ms. Narcisse's race and sex as a pretext to silence valid criticism of the Board's decision to hire Ms. Narcisse.

53.    In the May 19 order, the Board stated that Mr. Kim would not be able to attend future DAC meetings, Board meetings, and other District functions when those functions are located at the new junior high school where Ms. Narcisse is principal. District functions such as these are normally open to the general public, so Mr. Kim's freedom of speech, his freedom of assembly, and his freedom to petition the government for a redress of grievances are impacted by the current ban outlined in the May 19 order.

54.    The May 19 order largely rehashed the arguments made in the April 19 and April 28 letters. Moreover, the May 19 order either ignored the evidence Mr. Kim submitted in his appeal letter or unreasonably twisted that evidence to suit the Board's narrative.

55.    For instance, but without limitation, the Board disregarded the witness statements Mr. Kim submitted that indicate no physical altercation took place at the April 16 DAC meeting, and again falsely accused Mr. Kim of being the aggressor at the meeting despite all evidence to the contrary.

56.    The Board said in its May 19 order that "any reasonable person viewing the video can see that Dir. Molina was shaken by the initial encounter with Mr. Kim" at the April 16 DAC meeting. To the contrary, the video[5] makes it abundantly clear that Ms. Molina's accusations toward Mr. Kim at the DAC meeting were performative and pretextual.

57.    Despite claiming to feel threatened by Mr. Kim, Ms. Molina did not call the police. Instead, she continued to berate Mr. Kim on video (selfie style) for several minutes while sitting near him and doing her hair.

58.    The Board even stated in its May 19 order that it "does not condone Dir. Molina's part in the public confrontation with Mr. Kim at a DAC meeting." This statement indicates that the Board does not truly think Ms. Molina was feeling threatened, but went along with her story anyway to ban Mr. Kim from district property.

59.    In its May 19 order, the Board again accused Mr. Kim of spreading misinformation about Ms. Narcisse regarding the 2022 Business Process Audit. As explained above, however, Mr. Kim did not accuse Ms. Narcisse of any financial misconduct in his April 12 email. Rather, Mr. Kim merely stated that the audit identified various areas of concern that warrant further discussion.

---

[5] Which, again, is available for the Court's viewing pleasure upon request.

60.     The Board tacitly admits as much in its May 19 order.  The Board claims that Mr. Kim "couched" the audit in a way that "made it seem like" Ms. Narcisse was at fault.  Translation: the Board is punishing Mr. Kim for words he did not actually say and for words that the Board has put into his mouth through unreasonable inferences.

61.     In its May 19 order, the Board even admits that other people have gone further than Mr. Kim by explicitly accusing Ms. Narcisse of financial misconduct.  For instance, the Board said that the Chair of the DAC "raised additional allegations" claiming that Ms. Narcisse "engaged in what is tantamount to criminal conduct (i.e. misappropriation of funds)."  That the Board would refer to this claim as an "additional allegation" is an admission that said claim was not actually present in Mr. Kim's April 12 email.

62.     Furthermore, the May 19 order contains several statements to the effect that third parties have "parroted" Mr. Kim's concerns.  For instance, the Board states that "[t]he District then learned that at the April 21, 2025 city Council meeting for Commerce City – Mr. Kim is a city councilmember – individuals signed up for public comment where they parroted Mr. Kim's misinformation about Principal Narcisse and spoke against Dir. Molina's statements and conduct toward Mr. Kim."  This statement is an admission that the Board is punishing Mr. Kim based on the political speech activities of Mr. Kim and others who may agree with him.

63.     In its May 19 order, the Board also made the following statements:

    a.  "What is particularly troubling is that after Mr. Kim was advised his statements were false and misleading, he still refuses to make any public corrections on social media."

    b.  "Every day he fails to correct his misstatement is another day Principal Narcisse's reputation is harmed in the community."

    c.  "While Mr. Kim attempts to hide behind his claim of 'accountability,' we find his argument unpersuasive given the fact that he has been advised that his statements about Principal Narcisse are false."

    d.  "It also is not lost on the Board that Mr. Kim refuses to correct his public accusations against Principal Narcisse after he was given additional information about the financial audit."

64.     From these statements, it is apparent that the Board, a government entity, sought to compel retractions by Mr. Kim of his prior political speech, and that the Board punished Mr. Kim in part because he refused to issue such retractions.  Indeed, the Board explicitly cited "Mr. Kim's refusal to correct his misstatements about Principal Narcisse" as one of the bases for its decision.

65.     As explained herein, Mr. Kim exercised his right to engage in political speech.  The Defendants responded by engaging in a conspiracy to defame and retaliate against Mr. Kim, culminating in the Defendants banning Mr. Kim from district property.

66.     As a result of the Defendants' tortious acts and willful violations of Mr. Kim's constitutional rights, Mr. Kim has suffered damages in an amount to be determined at trial.

## FIRST CLAIM FOR RELIEF

*Viewpoint Discrimination in Violation of the First Amendment to the U.S. Constitution and Article II, Section 10 of the Colorado Constitution*

67.     Mr. Kim incorporates his previous allegations as if fully restated herein.

68.     "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* at 829. "Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* "Speech may not be banned on the ground that it expresses ideas that offend." *Matal v. Tam*, 582 U.S. 218, 223 (2017).

69.     The freedom of speech is at its zenith when it comes to political speech. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Buckley v. Valeo*, 424 U.S. 1, 14 (1976), *superseded by statute on other grounds*, (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). "Although First Amendment protections are not confined to the exposition of ideas, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, … of course includ[ing] discussions of candidates…." *Id.* (internal quotation marks and citations omitted). "This no more than reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Id.* (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

70.     As described above, Mr. Kim (a city councilman) engaged in political speech by emailing the Board and Dr. Loría on April 12, and by sharing that April 12 email with the community on social media. Mr. Kim's April 12 email entailed a "discussion of public issues and debate on the qualifications of candidates," including the qualifications of the Board and of Ms. Narcisse to lead a school within the district as its new principal. In the April 19 letter, Mr. Salazar as an agent of the Defendants even admitted that Mr. Kim's April 12 email contained political speech when he referred to Mr. Kim's dissemination of the email on social media as "ambush politics."

71.     The Defendants, who are government actors, retaliated against Mr. Kim based on the content of his political speech, namely his viewpoint of being critical of the Board and of Ms. Narcisse's qualifications.

72.    The Defendants retaliated against Mr. Kim in at least the following non-exhaustive ways:

a.    To the extent Ms. Molina was acting in her capacity as a Board member or as an agent of the Board during the April 16 DAC meeting, Ms. Molina and the Board forced Mr. Kim to leave the April 16 DAC meeting based on Ms. Molina's false and pretextual accusations of Mr. Kim physically attacking her and other women of color and threatening to call the police.  Ms. Molina knew her accusations against Mr. Kim were false, but she made them anyway in order to prevent Mr. Kim from attending the DAC meeting and thereby exercising his First Amendment rights at the meeting, including his freedom of speech, his freedom of assembly, and his freedom to petition the government for a redress of grievances.  Ms. Molina did so based on the content of Mr. Kim's political speech, namely his viewpoint of being critical of the Board and of Ms. Narcisse's qualifications.

b.    In the April 19 letter, Mr. Salazar as an agent of the Defendants sought to chill Mr. Kim's First Amendment rights by threatening Mr. Kim with a retaliatory ban from district property if Mr. Kim continued to express views that were critical of the Board and of Ms. Narcisse's qualifications.

c.    As evident from the April 28 letter, Dr. Loría banned Mr. Kim from district property for three (3) years based on the content of Mr. Kim's political speech, namely his viewpoint of being critical of the Board and of Ms. Narcisse's qualifications.

d.    As evident from the May 19 order, the Board restricted Mr. Kim from contacting Ms. Narcisse and from accessing the grounds of the new junior high school where Ms. Narcisse is principal for a period of three (3) years based on the content of Mr. Kim's political speech, namely his viewpoint of being critical of the Board and of Ms. Narcisse's qualifications.

73.    The Defendants' actions described herein impacted and continue to impact Mr. Kim's First Amendment rights of freedom of speech, his freedom of assembly, and his freedom to petition the government for a redress of grievances.

74.    As described herein, the Defendants' purported reasons for their actions are false and pretextual.  The Defendants sought to silence dissent by taking actions against Mr. Kim based on the content of his political speech, namely his viewpoint of being critical of the Board and of Ms. Narcisse's qualifications.

75.    Mr. Kim seeks injunctive relief from the Court to vindicate his constitutional rights.

## SECOND CLAIM FOR RELIEF
***Compelled Speech in Violation of the First Amendment to the U.S. Constitution and Article II, Section 10 of the Colorado Constitution***

76.    Mr. Kim incorporates his previous allegations as if fully restated herein.

17

77.    The First Amendment also protects against compelled speech, that is, "freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006).

78.    In its May 19 order, the Board made the following statements:

e.    "What is particularly troubling is that after Mr. Kim was advised his statements were false and misleading, he still refuses to make any public corrections on social media."

f.    "Every day he fails to correct his misstatement is another day Principal Narcisse's reputation is harmed in the community."

g.    "While Mr. Kim attempts to hide behind his claim of 'accountability,' we find his argument unpersuasive given the fact that he has been advised that his statements about Principal Narcisse are false."

h.    "It also is not lost on the Board that Mr. Kim refuses to correct his public accusations against Principal Narcisse after he was given additional information about the financial audit."

79.    From these statements, it is apparent that the Board, a government entity, sought to compel retractions by Mr. Kim of his prior political speech, and that the Board punished Mr. Kim in part because he refused to issue such retractions.  Indeed, the Board explicitly cited "Mr. Kim's refusal to correct his misstatements about Principal Narcisse" as one of the bases for its decision.

80.    As noted above, the Board could have transparently addressed Mr. Kim's concerns by simply sharing with the community the same context Mr. Salazar provided in his April 19 letter, which is contemplated by the First Amendment's purpose of fostering a "marketplace of ideas." In other words, if the Defendants thought Mr. Kim's statements were incorrect or out of context, they could have simply said so and offered a public explanation.

81.    The Defendants refused to do so and instead sought to compel speech by Mr. Kim. When Mr. Kim refused to engage in the compelled speech, the Board punished Mr. Kim with the sanctions outlined in the May 19 order.

82.    Mr. Kim seeks injunctive relief from the Court to vindicate his constitutional rights.

## THIRD CLAIM FOR RELIEF
### *Race and Sex Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution*

83.    Mr. Kim incorporates his previous allegations as if fully restated herein.

84.    The Equal Protection Clause of the Fourteenth Amendment guarantees equal protection under the law regardless of a person's race or sex.

85.    Ms. Narcisse is a Black woman.  Mr. Kim is not.  However, aside from using the "Ms." prefix, Mr. Kim's April 12 email made no reference whatsoever to Ms. Narcisse's race, sex, gender, or any other personal trait.  Nor did Mr. Kim's email contain any racist, sexist, or otherwise derogatory remarks about Mr. Narcisse.

86.    Even despite the fact that Mr. Kim's April 12 email was race-neutral and sex-neutral, the Defendants responded to Mr. Kim's email by baselessly accusing him of racism and sexism.

87.    It is apparent from **Exhibits 2, 3, and 5** that the Defendants are using Ms. Narcisse's race and sex as a pretext to silence valid criticism of Ms. Narcisse and of the Board's decision to hire her.

88.    But the Defendants went even further than just baselessly accusing Mr. Kim of racism and sexism to downplay his concerns.  The Defendants also took actions that infringed and continue to infringe Mr. Kim's First Amendment rights, and the Defendants did so in part because Mr. Kim is not a woman of color like Ms. Narcisse.

89.    The Defendants violated Mr. Kim's rights to equal protection under the law in at least the following non-exhaustive ways:

a.    To the extent Ms. Molina was acting in her capacity as a Board member or as an agent of the Board during the April 16 DAC meeting, Ms. Molina and the Board violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, because they conditioned Mr. Kim's exercise of his First Amendment rights on his race and sex.  Ms. Molina knew her accusations against Mr. Kim were false, but she made them anyway in order to prevent Mr. Kim from attending the DAC meeting and thereby exercising his First Amendment rights at the meeting, including his freedom of speech, his freedom of assembly, and his freedom to petition the government for a redress of grievances.  In light of Ms. Molina's statements prior to and during the DAC meeting falsely accusing Mr. Kim of being sexist and racist against women of color, such as by referring to Mr. Kim as an "entitled man," a white man, and a "machista," it is clear that Ms. Molina would not have falsely accused Mr. Kim of physical violence and threatened to call the police to force him to leave the DAC meeting had Mr. Kim himself been a woman of color.

b.    In the April 19 letter, Mr. Salazar as an agent of the Defendants sought to chill Mr. Kim's First Amendment rights by threatening Mr. Kim with a retaliatory ban from district property in part because Mr. Kim is not a woman of color.

c.    As evident from the April 28 letter, Dr. Loría banned Mr. Kim from district property for three (3) years in part because Mr. Kim is not a woman of color.

d.  As evident from the May 19 order, the Board restricted Mr. Kim from contacting Ms. Narcisse and from accessing the grounds of the new junior high school where Ms. Narcisse is principal for a period of three (3) years in part because Mr. Kim is not a woman of color.

90.  Mr. Kim seeks injunctive relief from the Court to vindicate his constitutional rights.

## FOURTH CLAIM FOR RELIEF
### *42 U.S.C. § 1983 – Civil Action for Deprivation of Rights*

91.  Mr. Kim incorporates his previous allegations as if fully restated herein.

92.  42 U.S.C. § 1983 states in pertinent part that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress….

93.  As described herein, the Defendants violated Mr. Kim's rights under the First and Fourteenth Amendments to the U.S. Constitution.

94.  The Defendants, who are government actors, did so under color of law.

95.  The Defendants violated Mr. Kim's constitutional rights in at least the following non-exhaustive ways:

a.  To the extent Ms. Molina was acting in her capacity as a Board member or as an agent of the Board during the April 16 DAC meeting, Ms. Molina and the Board forced Mr. Kim to leave the April 16 DAC meeting based on Ms. Molina's false and pretextual accusations of Mr. Kim physically attacking her and other women of color and threatening to call the police. Ms. Molina knew her accusations against Mr. Kim were false, but she made them anyway in order to prevent Mr. Kim from attending the DAC meeting and thereby exercising his First Amendment rights at the meeting, including his freedom of speech, his freedom of assembly, and his freedom to petition the government for a redress of grievances. Ms. Molina did so based on the content of Mr. Kim's political speech, namely his viewpoint of being critical of the Board and of Ms. Narcisse's qualifications.

b.  To the extent Ms. Molina was acting in her capacity as a Board member or as an agent of the Board during the April 16 DAC meeting, Ms. Molina and the Board violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, because they conditioned Mr. Kim's exercise of his First Amendment rights on his race and sex. Ms. Molina knew her accusations against Mr. Kim were

false, but she made them anyway in order to prevent Mr. Kim from attending the DAC meeting and thereby exercising his First Amendment rights at the meeting, including his freedom of speech, his freedom of assembly, and his freedom to petition the government for a redress of grievances. In light of Ms. Molina's statements prior to and during the DAC meeting falsely accusing Mr. Kim of being sexist and racist against women of color, such as by referring to Mr. Kim as an "entitled man," a white man, and a "machista," it is clear that Ms. Molina would not have falsely accused Mr. Kim of physical violence and threatened to call the police to force him to leave the DAC meeting had Mr. Kim himself been a woman of color.

c.  As evident from the April 28 letter, Dr. Loría banned Mr. Kim from district property for three (3) years based on the content of Mr. Kim's political speech, namely his viewpoint of being critical of the Board and of Ms. Narcisse's qualifications.

d.  As evident from the April 28 letter, Dr. Loría banned Mr. Kim from district property for three (3) years in part because Mr. Kim is not a woman of color.

e.  As evident from the May 19 order, the Board, including Defendants Reneé Lovato, Janet Estrada, Maria Zubia, and James Amador, restricted Mr. Kim from contacting Ms. Narcisse and from accessing the grounds of the new junior high school where Ms. Narcisse is principal for a period of three (3) years based on the content of Mr. Kim's political speech, namely his viewpoint of being critical of the Board and of Ms. Narcisse's qualifications.

f.  As evident from the May 19 order, the Board, including Defendants Reneé Lovato, Janet Estrada, Maria Zubia, and James Amador, restricted Mr. Kim from contacting Ms. Narcisse and from accessing the grounds of the new junior high school where Ms. Narcisse is principal for a period of three (3) years because Mr. Kim refused to engage in compelled speech.

g.  As evident from the May 19 order, the Board, including Defendants Reneé Lovato, Janet Estrada, Maria Zubia, and James Amador, restricted Mr. Kim from contacting Ms. Narcisse and from accessing the grounds of the new junior high school where Ms. Narcisse is principal for a period of three (3) years in part because Mr. Kim is not a woman of color.

96.  The Defendant Adams County School District 14 is vicariously liable for the above acts because it is the policy or custom of the Adams County School District 14, as demonstrated by its Board of Education, its superintendent of schools, and its chief legal counsel, to violate the First and Fourteenth Amendment rights of those who are critical of the Board and/or who are not women of color.

97.  As a result of the Defendants' tortious acts and willful violations of Mr. Kim's constitutional rights, Mr. Kim has suffered damages in an amount to be determined at trial.

21

**FIFTH CLAIM FOR RELIEF**
*42 U.S.C. § 1985(3) – Conspiracy to Deprive Mr. Kim of Equal Protection Under the Law*

98.    Mr. Kim incorporates his previous allegations as if fully restated herein.

99.    42 U.S.C. § 1985(3) states in pertinent part that:

If two or more persons in any State or Territory conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws … in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

100.    The Defendants Dr. Karla Loría, Reneé Lovato, Janet Estrada, Maria Zubia, James Amador, and Lucy Molina conspired with one another and with their non-party agents, including without limitation Mr. Salazar, to violate Mr. Kim's rights to equal protection under the law.

101.    The Defendants either did themselves or caused to be done the following non-exhaustive acts in furtherance of their object to violate Mr. Kim's rights to equal protection under the law:

    a.    To the extent Ms. Molina was acting in her capacity as a Board member or as an agent of the Board during the April 16 DAC meeting, Ms. Molina and the Board violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, because they conditioned Mr. Kim's exercise of his First Amendment rights on his race and sex. Ms. Molina knew her accusations against Mr. Kim were false, but she made them anyway in order to prevent Mr. Kim from attending the DAC meeting and thereby exercising his First Amendment rights at the meeting, including his freedom of speech, his freedom of assembly, and his freedom to petition the government for a redress of grievances. In light of Ms. Molina's statements prior to and during the DAC meeting falsely accusing Mr. Kim of being sexist and racist against women of color, such as by referring to Mr. Kim as an "entitled man," a white man, and a "machista," it is clear that Ms. Molina would not have falsely accused Mr. Kim of physical violence and threatened to call the police to force him to leave the DAC meeting had Mr. Kim himself been a woman of color.

    b.    The Defendants Dr. Karla Loría, Reneé Lovato, Janet Estrada, Maria Zubia, James Amador, and Lucy Molina caused their agent Mr. Salazar to chill Mr. Kim's First Amendment rights by threatening Mr. Kim with a retaliatory ban from district property in the April 19 letter in part because Mr. Kim is not a woman of color.

c. As evident from the April 28 letter, Dr. Loría banned Mr. Kim from district property for three (3) years in part because Mr. Kim is not a woman of color.

d. As evident from the May 19 order, the Board, including Defendants Reneé Lovato, Janet Estrada, Maria Zubia, and James Amador, restricted Mr. Kim from contacting Ms. Narcisse and from accessing the grounds of the new junior high school where Ms. Narcisse is principal for a period of three (3) years in part because Mr. Kim is not a woman of color.

102.    As a result of the Defendants' tortious acts and willful violations of Mr. Kim's constitutional rights, Mr. Kim has suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff Craig Kim respectfully requests that the Court permanently enjoin the Defendants from continuing to violate his constitutional rights, and Mr. Kim requests that the Court award him his damages, costs, and attorney fees, jointly and severally against the Defendants, together with such other and further relief as the Court deems just and proper.

## JURY DEMAND

PLAINTIFF YONG GEN KIM A.K.A. CRAIG KIM DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted this 9th day of July, 2025.

ROBINSON & HENRY, P.C.

By:    */s/ Nicholas J. Catalano*
Alexander Lowe, #36827
Nicholas J. Catalano, # 53787
*Attorneys for Plaintiff*

Concerns and Observations Regarding Leadership at Adams 14



↱ **Craig Kim** ⬛⬛⬛⬛⬛⬛⬛  📧 Sat, Apr 12, 11:44 AM (3 days ago)  ☆  ☺  ↩  ⋮

to rlovato, jestrada.boe, mdzubia.boe, jamador.boe, lmolina, kloria ▾

DATE FILED
July 9, 2025 4:35 PM
FILING ID: 4769FAED5F946
CASE NUMBER: 2025CV31076

Good morning, Adams 14 Superintendent and School Board Members,

I hope this message finds you well. As an 11-year resident of Commerce City, I wish to express my enthusiasm regarding the passage of the Bond and Mill measures last year. These initiatives represent a vital step toward providing the students of Adams 14 with the renovations and new facilities that are essential for their educational success and the future of our community.

However, I would also like to address some concerns regarding the new Junior High Principal, Ms. Narcisse, who previously served in Fairfax County, Virginia. During my military service, I spent a significant amount of time in Fairfax County, specifically in Reston, where I had the opportunity to connect with many parents and residents, some of whom have children who attended Justice High School during Ms. Narcisse's tenure.

While I plan to reach out to my contacts for further information, initial research has raised some concerns that I believe are important to bring to your attention.

I discovered reports regarding a tragic incident involving a 10th-grade student, Madeline Valeria Moran Centeno, who sadly overdosed in December 2023. This situation ignited considerable controversy among parents and educators in Fairfax County, drawing attention to the school environment during Ms. Narcisse's leadership following a social media post she made days after.

1st Link: https://annandaletoday.com/the-search-is-on-for-a-new-principal-at-justice-high-school/

2nd Link: https://www.sportskeeda.com/pop-culture/news-she-really-lived-name-justice-high-school-principal-tiffany-narcisse-slammed-insensitive-response-student-death

Additionally, I have attached a PDF of a Business Process Audit conducted on Justice High School in April 2022, shortly after Ms. Narcisse assumed her position in July 2021. This audit identifies various areas of concern related to financial management and processes, which warrant further discussion.

The audit report for Justice High School highlights several areas of concern related to financial management and processes, categorized as high and moderate risk findings:

High Risk Finding:

Lack of Review for Monthly Financial Management Reports (FMR): The audit indicated that there was insufficient evidence of review or supporting documentation for the FMR for December 2021, with the only exception being a late signature by the principal for the Non-Position approval. This absence of review raises concerns about unverified transactions and the potential for misappropriation of funds. Moderate Risk Findings:

Non-Bank Reconciliations: The audit identified discrepancies in procurement card reconciliations, including missing signatures and transactions lacking appropriate supporting documentation.

EXHIBIT 1

Insufficient Documentation: Some procurement card transactions were processed without proper pre-approval, and at least one transaction occurred through a personal account, resulting in unnecessary tax liabilities.

Bank Reconciliations: There were delays in reconciling bank accounts, along with discrepancies observed between the book balance and trial balances, which may hinder timely error detection and resolution.

Voided Cash Receipts: The documentation related to voided cash receipts was found to be inadequate, increasing the risk of potential fund misappropriation.

Incorrect Account Charged: A disbursement was initially charged to an incorrect account, although it was later rectified in the accounting records.

The report advises implementing timely reviews, adhering to proper documentation procedures, and providing training to address these issues effectively. It also emphasizes the need for management responses to all moderate and high-risk findings to ensure regular reviews and compliance with established procedures, thereby preventing future discrepancies.

It is crucial for both parents and educators, as well as the School Board and the Superintendent, to be aware of the backgrounds and experiences of newly appointed staff, especially as significant projects are underway to enhance our schools and community.

Lastly, I will be sharing this information with the Chairwoman of the Adams 14 District Accountability Committee and other residents for their awareness. I encourage the School Board and Ms. Narcisse to address these matters transparently with the community, as we strive for equitable treatment and continued success for all students in our disproportionately impacted and continued challenged community.

Thank you for your time and consideration.

Sincerely,

EXHIBIT 1

Craig Kim

 

**ADAMS 14**

**Joseph A. Salazar**
CHIEF LEGAL COUNSEL
5291 E. 60th Avenue, Commerce City, CO 80022
www.adams14.org | Phone: 303-853-3333

DATE FILED
July 9, 2025 4:35 PM
FILING ID: 4769FAED5F946
CASE NUMBER: 2025CV31076

April 19, 2025

***Via Electronic Mail:*** craig.kim2013@gmail.com
Craig Kim

Re:     Response to Your April 12, 2025 Email

Mr. Kim:

Your April 12, 2025 email sent to the Adams 14 Board of Education and Superintendent Dr. Karla Loría was forwarded to me for response. Once again, we are having to take time away from educating Adams 14 students to respond to a misguided communication from you involving allegations mired in half-truths, and outright misrepresentations. There are a couple of things that are particularly disturbing about your public posts on Facebook and your email to the Adams 14 Board of Education and Superintendent Loría.

First, you sent your email to the Adams 14 Board of Education and Superintendent Loría on Saturday, April 12, 2025 at 11:44 a.m. Judging by your subsequent text messages to Director Lucy Molina, you fancy yourself and your communications of such high priority that the Adams 14 Board of Education and Superintendent Loría should have immediately responded to your communication, assuming that emails were even reviewed over the weekend. It should be noted that Adams 14 Board members and Superintendent Loría were spending Saturday at a Colorado Association of Latino Superintendents and Administrators (CO-ALAS) conference where Superintendent Loría was named Colorado Superintendent of the Year.

Nonetheless, you made no attempts to reach out to any Adams 14 Board member or Superintendent Loría from Saturday to Tuesday – not even providing anyone the professional courtesy to alert them to your communication. Instead, on Tuesday, April 15, 2025, you intentionally and publicly posted on social media your email to the Adams 14 Board about a newly hired principal.

Second, the information you intentionally posted on social media to smear the newly hired principal is remarkably out of context or you intentionally misrepresented information. The newly hired principal was given the opportunity to address some of the issues you "discovered" on the internet before the decision was made to hire her. Not only is that the responsible and reasonable thing to do, but it also shows that Adams 14 administrators are thoughtful and caring individuals who believe in giving people the space to provide explanation.

For example, if you knew how audits work in the K-12 education realm, you would know that principals can order audits of their own school's financial processes as a best practice, which was done in the instant case. As you recognized, she was a new principal to the school. You also would know that an audit would identify strengths, weaknesses, and make recommendations on how to improve financial processes. Indeed, the audit identified five (5) areas requiring financial process improvements.

EXHIBIT 2

**Joseph A. Salazar**
CHIEF LEGAL COUNSEL
5291 E. 60th Avenue, Commerce City, CO 80022
www.adams14.org | Phone: 303-853-3333

Yet, your publicly posted email attempts to create a false narrative that the principal was engaged in some questionable conduct. As you stated in your email, "This absence of review raises concerns about unverified transactions and the potential for misappropriation of funds." The audit the principal ordered was the review for which she gathered valuable insight about the financial practices of the school she was charged to lead. She then was able to use this knowledge to improve the financial practices of the school she took over. Your email endeavors to lead the Adams 14 community on some frivolous walkabout of mistruths. What is particularly troubling is that you had every opportunity to question our new principal before you sent your email and posted on social media. Instead, you opted for ambush politics without regard to the truth.

In fact, your efforts can be seen in Brandi Valdez's April 15, 2025 email to the Adams 14 Board of Education and Superintendent Loría where she claims that she "discovered serious and repeated concerns tied to this individual's leadership specifically involving **the misappropriation of funds**..." Nowhere in the audit is there any such finding. Ms. Valdez's email mirrors much of the language in your email, and it is apparent she intended to parrot and spread your misinformation. Looking at your email and reviewing Ms. Valdez's email raises concerns that you both conspired to attack the reputation of our new principal with false allegations.

As a result of your public post attacking a newly hired principal, we have received complaints that you have a pattern and practice of targeting and attacking women of color. Our Adams 14 Board – four of whom are Latinas; the newly hired principal – a Black woman; and Superintendent Loría – a Latina – have been the subject of your ridicule, your condescending attitude, and your attacks. Yet, this public attack on a Black woman who went through a thorough vetting process by a nationally renowned firm, and she was vetted internally by the District, is far beneath the dignity of the Adams 14 community. It is tragically ironic that in your letter you claim a desire to seek equitable treatment, yet, the complaints against you indicate that you engage in bullying, harassing, discriminatory, and inequitable behavior.

Mr. Kim, in your email you claim to be a member of the Adams 14 community. You are not. You do not live in the District. You do not vote in the District. While you attend Adams 14's District Accountability Committee (the "DAC") meetings, you are not the designated liaison from Commerce City City Council. As you are aware, Councilwoman Kristi Douglas is the City Council liaison to the DAC. More often than not it appears your presence at DAC meetings is to sow discord within the District. Sadly, your attack on our new principal for our new junior high school already has clouded the excitement and energy the community was feeling as we move toward this incredible future. It goes without saying that responsible members of a community do not seek to negatively impact students, employees, or the community.

As a member of the public, you have the right to attend DAC meeting within the parameters of the law. That means you do not have the right to violate the rights of our Board members, superintendent, or employees. As there are concerns that your attack on our new principal may be race- and sex-based, our obligation to protect Adams 14 personnel includes ensuring that you do not retaliate against anyone for objecting to your behavior. Any further action by you that violates the rights of others, such as creating a hostile environment, will be met by expulsion from District property.

EXHIBIT 2

**Joseph A. Salazar**
CHIEF LEGAL COUNSEL

5291 E. 60th Avenue, Commerce City, CO 80022
www.adams14.org  |  Phone: 303-853-3333

That being said, based on your email, it appears you intend on continuing your personal campaign against our new principal. I will forward all text messages, social media posts, your correspondence, and this letter to her should she decide to seek counsel to advise her on any potential claims against you and others.

Lastly, I recognize that you may post this response on social media. Should you only post snippets of this response, I will ensure that the entirety of this letter is made public.

Please do not hesitate to contact me if you have any questions.

Sincerely,

Joseph A. Salazar
Chief Legal Counsel

EXHIBIT 2



**Dr. Karla Loría**
SUPERINTENDENT
5291 E. 60th Avenue, Commerce City, CO 80022
www.adams14.org | Phone: 303-853-3333

DATE FILED
July 9, 2025 4:35 PM
FILING ID: 4769FAED5F946
CASE NUMBER: 2025CV31076

April 28, 2025

*Via Electronic Mail:* craig.kim2013@gmail.com
Craig Kim

Re:     Notice of Restricted Access

Mr. Kim:

On April 19, 2025, you received a letter from Joe Salazar, Chief Legal Counsel for Adams County School District 14 (the "District"). The letter provided a detailed summary of offenses you have engaged in within the school district.

In particular, you were advised that we received complaints about your pattern and practice of targeting women of color in this district through your harassing and bullying conduct. We also reviewed your email to the Adams 14 Board of Education, which contains misstatements about our newly hired principal, who happens to be a Black woman, concerning her prior employment. We further considered your campaign to elicit the help of the Chair of the District Accountability Committee ("DAC") to spread this misinformation about our principal. As recently as Monday, April 21, 2025, other community members joined with you to continue the public spread of misinformation. In sum, you have targeted a Black female principal through a campaign of misinformation, which has resulted in harm to her reputation and is affecting her ability to lead the District's brand-new junior high school.

Despite receiving Mr. Salazar's letter, which notified you of your misstatements and provided context to information you have spread throughout community, you continue to engage in your reckless disregard of the truth.

We also have reviewed your text message communications with one of our Latina board members who outright objected to your behavior targeting a Black female principal. This communication then led to an encounter initiated by you against our board member at a public DAC meeting. The encounter was such that our board member felt physically threatened by you, and her children were traumatized by the encounter. You left the meeting, but only after the threat to call law enforcement was issued.

Mr. Kim, the District has a legal responsibility to protect our employees, our board, and members of the public from hostile and discriminatory conduct. The spread of your misinformation has created a hostile work environment for our principal and has damaged her reputation in the community to the point that Adams 14 community members are now parroting your misinformation. Your physical confrontation with our Latina board member has created safety concerns.

As such, you are hereby notified that based on your behavior that implicates the constitutional and statutory rights of others, you are restricted from all District property, including, but not limited to,

EXHIBIT 3



**Dr. Karla Loría**
SUPERINTENDENT
5291 E. 60th Avenue, Commerce City, CO 80022
www.adams14.org | Phone: 303-853-3333

programs, meetings, and District events for a period of three (3) years. The District will work with Commerce City's city attorney to discuss the best path forward involving events that take place on City property, such as joint meetings between City Council and the Adams County School District 14 Board of Education (the "Board"). This restriction is to ensure the safety of our employees and board members and to ensure that our students, staff, and faculty are afforded the right to pursue educational activities without intimidation.

You have a right to appeal this notice to the Board. You have ten (10) calendar days to appeal this decision in writing. Should you fail to appeal the decision, this prohibition will go into effect immediately upon the expiration of your right to appeal. If an appeal is received on or before the expiration of ten (10) business days, the Board will consider your appeal, all relevant information, and will issue its decision within ten (10) business days of receipt of your appeal.

Sincerely,

Dr. Karla Loría
Superintendent

EXHIBIT 3

# ROBINSON & HENRY, P.C.

## ———— Attorneys at Law ————

Denver • 7555 East Hampden Avenue, Suite 600, Denver, Colorado 80231

DATE FILED: July 9, 2025 12:15 PM
FILING ID: 4769FAED5F946
CASE NUMBER: 2025CV31076

May 5, 2025

*Via Email and U.S. Certified Mail:*

Joseph A. Salazar, Esq.
Chief Legal Counsel
Adams County School District 14
5291 E. 60th Avenue
Commerce City, CO 80022
jsalazar@adams14.org

> *RE: Adams 14 actions against Craig Kim*

> ## LETTER OF REPRESENTATION AND WRITTEN APPEAL

Mr. Salazar:

As I understand, you serve as Chief Legal Counsel for the Adams 14 Board of Education ("the Board"). This letter is therefore addressed to you to avoid communicating with an entity known to be represented by counsel.

This office represents Craig Kim regarding the April 19, 2025, letter he received from you, the April 28, 2025, letter he received from Dr. Karla Loría banning him from Adams 14 District property, and regarding the incident between Mr. Kim and Lucy Molina that occurred during the Adams 14 District Accountability Committee ("DAC") meeting on April 16, 2025. Please direct all future communications on these matters to this office.

### *Written Appeal*

Mr. Kim received the enclosed April 28, 2025, letter from Dr. Loría, banning him from Adams 14 District property. In that letter, Mr. Kim was given ten (10) calendar days to appeal the decision to the Board. Please consider this letter Mr. Kim's written appeal of the Board's decision to ban him from Adams 14 District property.

The April 28, 2025, letter from Dr. Loría contains several egregious misstatements. At no point has Mr. Kim ever harassed or bullied anyone, let alone harassed or bullied someone based on their sex, race, or any other personal trait. The purpose of Mr. Kim's April 12, 2025, email to the Board, enclosed, was to voice concerns about the Board's decision to hire Tiffany Narcisse as the new Adams 14 Junior High School Principal. As you know, the email made no reference

**ROBINSON & HENRY, P.C.**
Re: Adams 14 actions against Craig Kim
May 5, 2025

whatsoever to Ms. Narcisse's race, sex, gender, or any other personal trait. Rather, Mr. Kim voiced concerns about an incident in which Ms. Narcisse showed a lack of sensitivity and professional judgment following the death of one of her students during her previous employment at Justice High School in Fairfax County, Virginia. Mr. Kim also voiced concerns about a Business Process Audit that was conducted on Justice High School in April 2022.

At the end of his email, Mr. Kim stated that, in the interest of transparency, he would be sharing his concerns with the Adams 14 DAC and with other residents of the community. As such, Mr. Kim posted the email he sent to the Board on social media. Upon doing so, Ms. Molina began harassing Mr. Kim on social media and via text message. If you have not seen them already, copies of Ms. Molina's social media posts and text messages are enclosed. Far from addressing Mr. Kim's concerns with professionalism, as shown in the excerpt below, Ms. Molina resorted to name calling and falsely accusing Mr. Kim of being sexist.



EXHIBIT 4

**ROBINSON & HENRY, P.C.**
Re: Adams 14 actions against Craig Kim
May 5, 2025

**Lucy Molina**
You absolutely WRONG vato
6:10 PM
Read

**Me**
I don't see how my proof that I shared with you, the board, and the superintendent is wrong. You cannot go against facts.
6:10 PM
Read

**Lucy Molina**
Machistas ALWAYS picking on women
6:11 PM
Read

Conversation between Me and Lucy Molina - page 4 of 16

**Me**
So you're going to attack me because I am bringing it up actual facts? That is fucked up Lucy
6:11 PM
Read

**Lucy Molina**
that's Soo manly
6:11 PM
Read

**Lucy Molina**
Too bad
6:12 PM
Read

**Lucy Molina**
😢
6:12 PM
Read

EXHIBIT 4

**ROBINSON & HENRY, P.C.**
Re: Adams 14 actions against Craig Kim
May 5, 2025

Me

So now you're going to bring up it's a masculinity
thing. Dude, this is not about gender like you are
trying to make this out to be. This is about what is
right and what is wrong. It's about ethics it's not about
someone's race gender it's just strictly about their
experience

6:12 PM

Read

Lucy Molina

So disrespectful

6:12 PM

Read

Conversation between Me and Lucy Molina - page 5 of 16

Lucy Molina

Dude

6:12 PM

Read

Me

Lucy, your excuses right now is fucked up. To use the
excuse of me being disrespectful against women or
that it is a man thing that I am doing, that is what's
fucked up. You need to open your eyes because this
is bullshit dude

6:12 PM

Read

Lucy Molina

This DOESN'T win communities here DUDE

6:13 PM

Read

Lucy Molina

welcome to CONmerce City

6:14 PM

Read

4

EXHIBIT 4

**ROBINSON & HENRY, P.C.**
Re: Adams 14 actions against Craig Kim
May 5, 2025



The next day, on April 16, 2025, Mr. Kim and Ms. Molina attended an Adams 14 DAC meeting. Dr. Loría's characterization of what happened at the meeting is again egregiously false. Enclosed is the video Ms. Molina recorded and live streamed during the meeting, in which she is seen repeatedly berating Mr. Kim, who was minding his own business. Also enclosed are written statements from some of those in attendance who witnessed the encounter, and those statements are included below for ease of reference.

**Statement of Patricia L. Thurston:**

Craig

As you know Brandi Valdez and I speak often on the concerns for our district and the children we try to build a good education system for. Brandi asked if I wouldn't mind providing a statement about the events of the evening of April 16th, at the DAC retreat. I have no problem providing this statement of the event.

Statement:
When I had arrived at the Eagle Point Rec center the evening of April 16th for the DAC retreat, entering the room, I heard Luz Molina was speaking of a post Craig Kim posted on social media, addressing concerns on hiring Narcisse as a JrHigh principal. Luz sounded very angry about the post of a letter Mr Kim sent the school board. I felt Mr Kim's post was very enlightening, voicing concerns for the hiring process in bringing on Narcisses', with her documented, questionable school expenditures, in past her school district.

I made attempts to avoid Luz' conversation, but one's presence in the room, forced us all into the argument Luz was creating if one wasn't agreeing with her perception of the post, that it was racist and sexist, against women. I was dragged into Luz' conversation, myself, saying I appreciated the post, I now had questions as to Adams14 hiring practices. I voiced we already had issues with accountability and now hiring a principal with questionable accounting practices was not a good stance. Inwas not the onlyperson who voiced concernsduring Luz' rampage. Luz M kept bringing it around that Mr Kim was being racist and had issues with a female being hired. Myself, quite shocked at Luz's behavior as a board member and to keep attacking Mr Kim's character, when he was not yet present. I had not realized yet, Luz was recording the event!

EXHIBIT 4

**ROBINSON & HENRY, P.C.**
Re: Adams 14 actions against Craig Kim
May 5, 2025

When I did see Mr Kim enter the building, I went around to let Craig know, as an associate, how aggressive Lucy was being, to be aware she was in what I called "attack mode"!

When Mr Kim enter the retreat room, Luz was apparently video recording the event and lit into Craig Kim, Luz was yelling, that she felt violated and "was afraid as a women of color to have Mr Kim in the room"! Luz kept demanding Mr Kim be removed, that she was afraid! Pointing out she brought protection with her, because she felt violated and afraid!

Shortly after, the board Superintendent Loria and the attorney, Joe, came into event. Here was Luz, videoing recording, yelling at Craig, how she felt afraid, demanding Craig be removed. Craig was finally given a moment to speak, and graciously left the retreat.

I had at this point, realizing Luz was recording us all, asked she stop, as I did not wish to be part of video. Luz continued her rampage, going on and on, how she was violated, that Craig "attacked" Narcisses' because she was a black woman. Several in the room spoke out against Luz' remarks, each stating Craig had brought to light questions we all would like answers too. Luz kept rampaging on, with several attempts made by DAC chair to begin in the event. Luz continued for some time into the session, each moment she could, she dove back into her rampage how she felt Craig was being racist and against woman! I had asked several times during this, for Luz to stop recording me.

Regards
Patricia Thurston

**Statement of Brandi Valdez, DAC Chairman:**

On April 16, 2025 we had our Adams 14 District Accountability Committee annual retreat held at the Eagle Point Rec center.

I was talking to Lucy Molina about an email that I wrote to the Adams 14 School Board and district leadership concerning the new hire of a Middle School Principal. When Craig Kim walked in carrying a notebook. When Lucy told him to sit down forcefully and Craig said I'm not doing this tonight, and left the room where Lucy was getting verbally aggressive Craig walked back in and Lucy started yelling that he is racist and how dare he try to hold a women of color back! Craig again repeated he was not going to have this conversation at the DAC. Where Lucy continued to tell him he was racist against women of color. Craig then firmly spoke over her yelling and pointed at Lucy and told her I am not doing this in front of children and walked out of the room again. My oldest child Leianna walked out after him and was asking him if he was okay.

EXHIBIT 4

**ROBINSON & HENRY, P.C.**
Re: Adams 14 actions against Craig Kim
May 5, 2025

I started the meeting at 6:10pm 10 minutes late because of this confrontation. I did my opening greeting introduced Who I was and then get an icebreaker, the icebreaker was to introduce yourself and something that you are that begins with the first letter of your name, there were three women that went before Craig Kim and then Lucy Molina was next where she atthis time was recording the meeting. Which several people told Lucy they were not comfortable with her recording them and did not have there permission.I did not realize that she had already been recording until I went back and seen the videos that were later posted. Live streamed online. and Lucy Molina started with explaining who she was that she was an Adams 14 board member that she was there as a board member and that she felt physically threatened by Craig Kim just being in the room and that he had assaulted her which did not happen and proceeded to continue going, Craig was not responding. I was looking at the district leadership in the room to see how to proceed with handling the situation which then proceeded to get out of hand. Lucy Molina then proceeded to start yelling at the parents in the room, saying racist things to them screaming how Craig Kim is yelling at her like a white man And that he is a threat to women of color and threatening Her in front of her kids and my kids as well. My two daughters Leianna Demos age 15 and Dominaya Demos age 12 ended up having a anxiety attack and PTSD. Leianna was plugging her ears and rocking herself while this confrontation was going on until she signed to me that she needed to leave the room which then I told her to go And the fighting continued. Lucy was threatening Craig if he didn't leave she would call the cops on him. I tried several times to get the meeting back on track unsuccessfully after Lucy was fighting with other parents that I yelled for everyone to stop. And take a minute to calm down. At this point Craig said out of respect for the kids and the other members he would leave.. so Craig Kim left the meeting. But it did not stop there. The conflict continued with Lucy making statements about being bullied by Craig and then later continued her tirade on Facebook. Which I do that screenshots of of the facebook interaction as well as the emails I sent and the letter I received from the school attorney as well as the videos that Lucy Molina live streamed from the meeting. After the meeting and I seen the video I realized Lucy was recording my Two girls speaking with Craig Kim while she was saying he was a threat to women of color( which for context my girls are Native American) Also on the video several times she made comments about White women while pointing the camera towards members of the DAC. She also told several people where her location was that her gente should come down. Several people who were in the room had come to me during the confrontation and after saying how they felt threatened by Lucy Molina's actions.

Brandi Valdez
DAC Chairman
720-397-0086

EXHIBIT 4

**ROBINSON & HENRY, P.C.**
Re: Adams 14 actions against Craig Kim
May 5, 2025

**Statement of Tiffany Dixon:**

To Whom it may Concern,

My Name is Tiffany Dixon, My Role in Adams 14 is solely a parent in the community. I recently started attending meetings within the school district as my schedule allows. I currently have 2 children enrolled in Adams 14. My oldest is 13 and attends Kearney Middle School, The youngest is 4 and attends Sanville pre-school. We have been in Adams 14 school district since the oldest was in pre-school.

I am writing this letter on behalf of Mr.Craig Kim. I attended a D.A.C. meeting for Adams 14 in March where I witnessed inappropriate behavior towards Mr.Kim from a school board member Ms.Lucy Molina. I would like to note I was a few minutes late to the meeting so I did not witness the initial confrontation, so I can not speak on that. When I arrived the attendees were doing an "ice breaker" we were to State our name and something about us that begins with the first letter of our name. All seemed smooth until....It was Ms.Molina's turn to speak. She got very hostile stated her name,and asked that Mr.Kim be asked to leave as she felt very threatened by him. She was threatening to call the police and have him removed because she felt threatened as a "woman of color". She stated that he verbally and physically attacked her. I at that time had witnessed neither. Mr.Kim then got up and chose to leave the meeting. I imagine he felt compelled in such way after being embarrassed and called an entitled racist and sexist man not only on a social media post but right there at the meeting. I believe that Ms.Molina's behavior stemmed from her not liking a post Mr.Kim had posted to the community about a recent hire in our district. The information Mr.Kim posted is all public information and can be found amongst the internet. Ms.Molina did post live feeds on her Facebook and was very opinionated in them speaking about Mr.Kim,and other attendees in the room.

I personally feel Mr.Kim did nothing wrong. I feel as if Ms.Molina had or has some sort of vendetta against Mr.Kim. I feel that Mr.Kim being asked to not attend meetings in Adams 14 is not ok. He has went above and beyond to help our community and has remained very consistent with involvement in the school board. I feel that Ms.Molina is wrecking Mr.Kim's character by speaking poorly about him on Facebook in private groups amongst the community.

If you have any further questions please feel free to reach out to me. Thank you for your time.

Sincerely,

Tiffany Dixon
720-628-4237
tmjgoldy1@gmail.com

EXHIBIT 4

**ROBINSON & HENRY, P.C.**
Re: Adams 14 actions against Craig Kim
May 5, 2025

## Statement of Desirae Stephens:

Desirae stephens
(720)205-5604
ladii.unique.14@gmail.com

I Desirae Stephens was a witness to the incident that occurred between Craig Kim and Lucy Molina on the day of 4/16/2025 at the Adams 14 DAC/SAC/PTO Retreat. I am the parent of the district.

What fallows is from my point of view and the facts as far as I know them.

A few other moms from the school were having a conversation. Suddenly I hear Lucy screaming at Craig. How he shouldn't be doing that in front of her children it's rude and disrespectful . He walks in sits down. Lucy the graves her phone to record live on facebook. She then is on live and starts speaking in Spanish and English said that Craig is a racist and entitled. He sat there like an adult while Lucy acted like a child yelling and recording in his face. She said she was scared for her life. And if he didn't leave she would call the police. Brandi and Joe handled it to the best of there ability but Craig did end up getting out of his seat and left. Lucy continued on the whole meeting. Thanks for listening if you have any questions feel free to reach out thank you.

## Statement of Selena Baca:

Selena Baca
(303) 875-6098
smp80211@yahoo.com

I Selena Baca was a witness to the incident that occurred between Craig Kim and Lucy Molina the day of 4/16/25 at the Adams 14 DAC/SAC/PTO Retreat. I am a parent of the district.

What follows is from my point of view and the facts as far as I know them.

From where I was sitting in the meeting room I was facing the door that Craig Kim entered into the room. I noticed him in the hallway speaking with some older kids and he seemed to be in a positive upbeat mood. The very second, he entered the meeting room Lucy Molina begin to raise her voice and made a statement, here comes that white man that likes to go around attacking women of color. I heard Craig respond with something like that was not the reason he was at this meeting and not the place for this discussion. She continued to be loud and say things like how entitled white men can hate on women of color. Craig sat down and was ignoring her ridiculous outburst and speaking with a couple of the high school girls that were also attending the meeting. In my opinion the more Craig tried to ignore

EXHIBIT 4

ROBINSON & HENRY, P.C.
Re: Adams 14 actions against Craig Kim
May 5, 2025

Lucy the louder she thought she needed to be. Making derogatory statements in Spanish and even referring to him as a "vato". I heard her mention that she was either going live or maybe she was already live and continued with the derogatory statements in Spanish. I feel the meeting continued to proceed in its best efforts not to feed into the ridiculous behavior being caused by Lucy Molina. The meeting was moving forward with its ice breaker of introductions. When it was time for Lucy's turn her tone became very aggressive and she started saying she was feeling threatened by Craig Kim. I was so confused as to me she seemed to be the one acting as the aggressor. She accused him of attacking women of color in the city and requested he be removed from the meeting. Even making remarks as to calling the police. I feel that Lucy Molina used her position as a school board member to bully and threaten Craig Kim. I also feel that she falsely used certain verbiage to continue her attack against Craig Kim. If I am being completely honest Lucy Molina's behavior was making me feel very unsafe. She was coming across very confrontational and telling her "live" audience to come on down to the DAC meeting. She made me feel like she was trying to cause more bulling and even create physical altercations. Craig Kim handled himself in a respectful professional manor. Whereas Lucy Molina left me with an impression of someone who takes pride in adult bullying.

As you can see from these written accounts from witnesses who were present, Mr. Kim did nothing to create a hostile or threatening environment at the DAC meeting. That was the doing of Lucy Molina, the aggressor and agitator. Moreover, Ms. Molina told her Facebook Live audience that Mr. Kim "physically" attacked her. Such statements constitute actionable defamation, because Mr. Kim never touched her.

Women of color, like Ms. Molina and Ms. Narcisse, are entitled to all the same rights and privileges as everyone else in this country. But they are not above criticism or disagreement. Mr. Kim has voiced his concerns without ever making it about anyone's race or sex, or any other personal trait. It is unconscionable for Ms. Molina, Dr. Loría, and the Board to do the opposite and baselessly accuse Mr. Kim of racism and sexism because he has the gall to disagree with them. In short, it is a weaponization of race and sex. It is a slap in the face to every person who deals with real racism or real sexism, and false accusations like these undermine the credibility of those who fight to eliminate real racism and real sexism.

As mentioned above, Mr. Kim has a claim against Ms. Molina for defamation, as well as against Adams 14 if Ms. Molina was acting as an agent of the Board. "The elements of a defamation claim are (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication." *L.S.S. v. S.A.P.*, 2022 COA 123, ¶ 35 (internal quotation marks omitted). To be defamation per se, that is, to be actionable without proof of special damages, a statement must be (1) on its face and without extrinsic proof, unmistakably recognized as injurious (defamatory meaning) and (2) specifically directed at the plaintiff (identity). *Gordon v. Boyles*, 99 P.3d 75, 78-79 (Colo. App. 2004). For instance, a statement that Mr. Kim committed

10

EXHIBIT 4

ROBINSON & HENRY, P.C.
Re: Adams 14 actions against Craig Kim
May 5, 2025

a criminal offense by physically assaulting Ms. Molina is defamation per se. *Gordon v. Boyles*, 99 P.3d 75, 78-79 (Colo. App. 2004). All of the elements of a defamation claim are satisfied here. Ms. Molina accused Mr. Kim of physically assaulting her; she communicated that statement to a Facebook Live audience of third-persons; she knew the statement was false; and the statement is defamatory per se and has harmed Mr. Kim's reputation.

Mr. Kim also has claims against Adams 14 for violations of his civil rights under the First and Fourteenth Amendments to the U.S. Constitution, as well as under Article II, Section 10 of the Colorado Constitution. Those rights include freedom of speech, the freedom to assemble and to petition the government for redress of grievances, and the right to equal treatment under the law without regard to race or sex. Adams 14 has violated these rights by suppressing Mr. Kim's speech, assembly, and petition rights while treating him differently than he would have been treated if he were a woman of color. If Mr. Kim is forced to pursue litigation, he will be entitled to his attorney fees as the prevailing party. 42 U.S.C. § 1988(b).

Mr. Kim hereby demands that the Board immediately reverse its decision to ban him from Adams 14 property. Furthermore, Mr. Kim demands that Ms. Molina recuse herself from the decision-making process. Mr. Kim reserves all available rights and remedies.

Regards,

Nicholas J. Catalano, Esq.
Alexander C. Lowe, Esq.
nicholas.catalano@robinsonandhenry.com
alexander.lowe@robinsonandhenry.com

Enclosures:
- April 28, 2025, letter from Dr. Loría;
- Mr. Kim's April 12, 2025, email to the Board;
- Videos showing social media posts by Ms. Molina;
- Text messages between Mr. Kim and Ms. Molina;
- Video created by Ms. Molina at the DAC meeting;
- Written statements from Patricia L. Thurston, Brandi Valdez, Tiffany Dixon, Desirae Stephens, and Selena Baca.

The enclosures may be downloaded from the following link:
https://drive.google.com/drive/folders/11HHH_rHNBabw_0K59Hg9wgXziUlomVVQ?usp=drive_link

11

EXHIBIT 4

Docusign Envelope ID: 5BFCCDD7-5D6D-4CBF-B789-785Y86PF24C7

| ADAMS COUNTY SCHOOL DISTRICT 14<br>BOARD OF EDUCATION<br>5291 E. 60th Avenue<br>Commerce City, Colorado 80022 | DATE FILED<br>July 9, 2025 4:35 PM<br>FILING ID: 4769FAED5F946<br>CASE NUMBER: 2025CV31046<br>**BOARD USE ONLY** |
|---|---|
| In Re: Craig Kim Appeal of Notice of Restricted Access | |

### ORDER

This matter is before the Adams County School District 14 Board of Education ("Board of Education" or the "Board") based on an appeal of the Superintendent's Notice of Restricted Access ("Notice") to Craig Kim. Mr. Kim was given appeal rights to the Board, which was timely filed on May 5, 2025.

Being duly advised in the premises, the Board hereby finds and orders as follows:

### *Procedural Background*

**Superintendent's Notice:**

On April 28, 2025, the Superintendent of Schools, Dr. Karla Loría, issued the subject Notice to Craig Kim. This Notice was provided to Mr. Kim for the following reasons:

1.      Mr. Kim has engaged in a pattern and practice of targeting women of color in the district through harassing and bullying conduct. Specifically, he sent an email to the Adams 14 Board of Education, which he posted on social media, containing misstatements about a newly hired principal – the District's first Black female principal who will lead the District's new junior high school.

2.      Mr. Kim elicited the help of the Chair of the District Accountability Committee ("DAC") to spread his misinformation about the District's new principal.

3.      Mr. Kim's misinformation was parroted by members of the Adams 14 community on April, 21, 2025.

4.      Mr. Kim's text message communication with a Latina Board of Education member who objected to his discriminatory conduct led to a confrontation with the same Latina Board Member at a DAC meeting, and the Board member expressed concern regarding her physical safety with Mr. Kim's presence.

EXHIBIT
5

PENGAD 800-631-6989

Docusign Envelope ID: 5BFCCDD7-9D0D-4CBF-B789-765180FF24C1

Superintendent Loría found that based on Mr. Kim's behavior "that implicates the constitutional and statutory rights of others," he was restricted from all District property, including, but not limited to, programs, meetings, and District events for a period of three (3) years. As stated by Superintendent Loría, Mr. Kim's restriction "is to ensure the safety of [the District's] employees and board members and to ensure [the District's] students, staff, and faculty are afforded the right to pursue educational activities without intimidation."

### *Findings of Fact*

On April 12, 2025, Mr. Kim submitted an email addressed to this Board regarding the District's new junior high school principal, Tiffany Narcisse. She previously served as a principal in Fairfax County, Virginia. After an exhausting and thorough search for the junior high school principal position, Principal Narcisse was selected to head the District's new junior high school. The Board also notes the pride and excitement behind Ms. Narcisse as this District's first Black female principal.

Mr. Kim's email, however, focused on negative media coverage associated with Principal Narcisse involving the death of a 10th grade student who overdosed in December 2023. According to press coverage, Principal Narcisse was accused of having a tone deaf response to the loss of a student. The District was aware of the media coverage prior to Principal Narcisse's hire, and she was provided an opportunity to discuss the matter during the interview process.

In addition to the media coverage, Mr. Kim produced an audit report of the high school in Virginia where Principal Narcisse served. Mr. Kim selected quotes of the audit report that he believed showed concerns about Principal Narcisse. Mr. Kim provided no context about the audit, who ordered the audit, or how audits in the K-12 environment are conducted. Mr. Kim concluded, without context: "This audit identifies various areas of concern related to financial mismanagement and processes, which warrant further discussion."

Mr. Kim concluded his email by indicating that he will share the provided information with the Chair of the District Accountability Committee ("DAC") and other residents. It appears Mr. Kim made good on his promise to reach out to the Chair of the DAC.

On April 15, 2025, the Chair of the DAC sent an email to the Board, Superintendent Loría, and some members of Superintendent Loría's Cabinet. The Chair's email mirrored Mr. Kim's allegations, except she raised additional allegations that are not supported by any facts or evidence provided to the Board. The Chair of the DAC claimed that Principal Narcisse engaged in what is tantamount to criminal conduct (i.e. misappropriation of funds). She further claimed, without evidence, that Principal Narcisse engaged in "multiple instances of staff mistreatment," and that, "These are not isolated incidents, but rather patterns that raise questions about both professional conduct and leadership ethics."

On April 15, 2025, Mr. Kim and Adams 14 Board Member Lucy Molina exchanged text messages related to Mr. Kim's email to the Board. Dir. Molina advised Mr. Kim that she found his attack on Principal Narcisse to be "pretty Fd up and DISRESPECTFUL…" Mr. Kim responded, "I don't see how fucked up that is Lucy because I even brought it to your attention and you gave two shits about it." Mr. Kim claimed that he brought concerns about Principal Narcisse to the Board for accountability



EXHIBIT

5

Docusign Envelope ID: 5BFCCDD7-9D0D-4CBF-B789-765180FF24C1

purposes, which assumed that the District did not already have the information he presented at hand during the interview process.

Dir. Molina responded, "Machistas ALWAYS picking on women." Mr. Kim responded with the following statement to Dir. Molina, "Lucy, your excuses right now is fucked up. To use the excuse of me being disrespectful against women or that it is a man thing that I am doing, that is what's fucked up. You need to open your eyes because this is bullshit dude"

On April 16, 2025, both Mr. Kim and Dir. Molina attended the DAC meeting. Witness statements are convoluted concerning the time line of events as they unfolded. However, what is certain is that Dir. Molina and Mr. Kim had a verbal confrontation at some point when he walked into the meeting room. Also, what is certain is that Dir. Molina expressed objection to Mr. Kim targeting a Black woman with his attacks. Dir. Molina expressed feeling threatened by Mr. Kim and asked him to leave or that she would call the police. At some point after the initial verbal confrontation with Mr. Kim, Dir. Molina began recording via Facebook Live, which was provided to the Board by Mr. Kim's attorney.

Dir. Molina expressed that Mr. Kim came in "all feisty… Men fighting with girls." This is where she verifies that she was not live during the initial encounter. Dir. Molina expressed concern that men, like Mr. Kim (pointing her camera toward him), "think they can yell at women like me – women of color – Mexican women, African American women." She then invited people to come to the DAC meeting. Dir. Molina then stated the following:

"So disrespectful that a councilman, así, talk to me like this. I am also an elected official… I'm tired that men feel entitled to disrespect women of color everywhere whether we're elected officials or not…"

Dir. Molina expressed objection to being expected to "shut up." Again, she expressed concern that men can disrespect women publicly, on social media, and in front of family. She then pointed the camera at Mr. Kim. Dir. Molina alleged that Mr. Kim yelled at her, and offended her in front of her children.

In response to posts on the Facebook Live feed, Dir. Molina stated that, "They've been attacking us for two days." Dir. Molina stated that she felt threatened and expressed, "maybe we need to call the cops."

The Chair of DAC then engaged in an "ice breaker" for the participants in the room. When prompted, Dir. Molina stated her name and then notified the participants that she felt threatened by Mr. Kim when he walked into the room yelling at her. She asked him to leave. She stated, "As a woman of color, he's been attacking our women of color in the city lately. He did it right now physically and verbally, and you guys all watched it… this is our Councilman Craig Kim from Commerce City and I feel threatened by him sitting next to me when he walked in very aggressive... he should be escorted out right now…" Dir. Molina's comment sparked discussion amongst the DAC participants, which was then interrupted by the Chair of DAC.



EXHIBIT

5

Dir. Molina reiterated that she did not feel safe, and that she would call the police. Mr. Kim then left the DAC meeting. Again, Ms. Molina stated that women of color and a Black woman were being attacked by Mr. Kim.

On April 19, 2025, the Board's Chief Legal Counsel sent letters to Mr. Kim and the Chair of the DAC addressing the misrepresentations made by both individuals. First, they were advised that Principal Narcisse was given the opportunity to address some of the issues Mr. Kim and the Chair of the DAC "discovered" during the hiring process. Further, Mr. Kim and the Chair of the DAC were provided information about the financial audit, particularly that Principal Narcisse ordered the financial audit as the new principal of the school, and she was able to use the audit's findings to improve the school's financial processes.

It was expressed to Mr. Kim that his allegations "endeavor to lead the Adams 14 community on some frivolous walkabout of mistruths." The letter further noted that both Mr. Kim and the Chair of the DAC had opportunities to address their concerns with Principal Narcisse, but they opted to post their allegations on social media, which appeared to be ambush politics without regard to the truth.

Mr. Kim was further notified that complaints about his behavior indicated that he has a pattern and practice of targeting and attacking women of color. Mr. Kim was notified that women of color, such as Principal Narcisse and Superintendent Loría have been the subject of his ridicule, his condescending attitude, and his attacks.

Mr. Kim was reminded that while he has a right to attend DAC meetings, he is not a member of the Adams 14 community, he does not live in the District, he does not vote in the District, and he is not the designated liaison from the City Council of Commerce City to the DAC. The District's counsel notified Mr. Kim that as there are race- and sex-based complaints against him, it is the District's obligation to ensure that Mr. Kim does not retaliate against anyone for objecting to his behavior. Mr. Kim was notified that any further action by him that violates the rights of other, such as creating a hostile environment, would be met by expulsion from District property.

Lastly, Mr. Kim was advised that all text messages, social media posts, his correspondence to the District, and the District counsel's letter would be provided to Principal Narcisse should she seek her own counsel to advise her on any potential claims against Mr. Kim.

The District then learned that at the April 21, 2025 City Council meeting for Commerce City – Mr. Kim is a city councilmember – individuals signed up for public comment where they parroted Mr. Kim's misinformation about Principal Narcisse and spoke against Dir. Molina's statements and conduct toward Mr. Kim.

On April 28, 2025, Superintendent Loría sent Mr. Kim a Notice of Restricted Access, which provided due process rights. Superintendent Loría notified Mr. Kim of complaints related to his pattern and practice of targeting women of color in the District through his harassing and bullying conduct. Upon review of the evidence, Superintendent Loría found that Mr. Kim and community members "continue the public spread of misinformation, which has resulted in harm to [Principal Narcisse's] reputation and is affecting her ability to lead the District's brand-new junior high school."



EXHIBIT

5

Superintendent Loría noted that Mr. Kim was advised of his misstatements, he was provided context to information he has spread throughout the community, but he nevertheless continues to engage in reckless disregard for the truth. Superintendent Loría advised that she reviewed Mr. Kim's text message communications with Dir. Molina who objected to Mr. Kim's behavior targeting a Black female principal, which then led to the encounter during the DAC meeting.

Mr. Kim was advised of the District's legal responsibility to protect its employees, Board members, and members of the public from hostile and discriminatory conduct. Superintendent Loría found that Mr. Kim's spread of misinformation "has created a hostile work environment for our principal and has damaged her reputation in the community to the point that Adams 14 community members are now parroting misinformation. Your physical confrontation with our Latina board member has created safety concerns."

Superintendent Loría concluded that because Mr. Kim's behavior implicates the constitutional and statutory rights of others, he was restricted from all District property, including, but not limited to, programs, meetings, and District events for a period of three (3) years. Superintendent Loría assured Mr. Kim that the District would work with Commerce City's city attorney involving events that take place on City property. As stated by Superintendent Loría, the restriction was "to ensure the safety of our employees and board members and to ensure that our students, and faculty are afforded the right to pursue educational activities without intimidation."

### Conclusions of Law

The First Amendment of the United States Constitution prohibits a government to restrict expression because of its message, its ideas, its subject matter, or its content. *Ashcroft v. Amer. Civil Liberties Union*, 535 U.S. 564, 573 (2002). The freedom of speech, however, "is not absolute at all times and under all circumstances." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942). The First Amendment is not made of absolutes: it was never "intended to secure to every citizen an absolute right to speak, or write, or print, whatever he might please"; to think so "is a supposition too wild to be indulged by any rational man." Joseph Story, *Commentaries on the Constitution* 703 (1833).

For example, in a line of cases, the United States Supreme Court held that the First Amendment does not protect those engaged in defamation or false statements of fact. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988) ("[f]alse statement of fact are particularly valueless [because] they interfere with the truth-seeking function of the marketplace of ideas"); *Brown v. Hartlage*, 456 U.S. 45, 60-61 (1982) (False statements "are not protected by the First Amendment in the same manner as truthful statements"); *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake); *Herbert v. Lando*, 441 U.S. 153, 171 (1979) ("Spreading false information in and of itself carries no First Amendment credentials"); *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) ("[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection"). The gravamen behind the loss of First Amendment protection is whether the statement is a "knowing or reckless falsehood." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964).



EXHIBIT

5

Mr. Kim's conveyance of Principal Narcisse's post following the death of a student are well documented, and the District was aware of the post and controversy surrounding this matter prior to the time of hire – interview processes are particularly adept at discovering information about job applicants. As explained to Mr. Kim, Principal Narcisse was afforded the respect to provide an explanation of what occurred. We do not find the information concerning Principal Narcisse's response to the death of a student, which Mr. Kim spread through the District via his social media post, was untruthful or a knowing or reckless falsehood.

However, Mr. Kim's statements about the financial audit are a different matter. It was reckless for Mr. Kim to couch the financial audit as one that targeted any wrongdoing by Principal Narcisse at her former school. As Mr. Kim admitted in his own email, Principal Narcisse was new to the school. Had Mr. Kim conducted any cursory investigation, he would have learned that Principal Narcisse ordered the financial audit as the new principal precisely because she wanted to understand the financial processes and financial obstacles of the school she was about to helm. It was through this financial audit that information came to light about the strengths and weaknesses of the school's financial processes.

Mr. Kim, in his social media post, and in the email to the Board, made it seem like the weaknesses and concerns identified in the financial audit were of Principal Narcisse's making. What is particularly troubling is that after Mr. Kim was advised his statements were false and misleading, he still refuses to make any public corrections on social media. His reckless statements then led to Adams 14 community members, including the Chair of the DAC, parroting his misstatements in public, including at a city council meeting where he sits as a city council member.

Thus, Mr. Kim, who is the root of misinformation concerning the financial audit, has allowed a false narrative about Principal Narcisse to spread through the community without accepting any responsibility for his acts. Every day he fails to correct his misstatement is another day Principal Narcisse's reputation is harmed in the community. We recognize the guidance of the Tenth Circuit Court of Appeals where it was held that false statements causing a legally cognizable harm are not entitled to First Amendment protections. *Animal Legal Defense Fund v. Kelly*, 9 F.4th 1219, 1232 (10th Cir. 2021). By virtue of the harm to Principal Narcisse, the District also is harmed as the celebration and community joy behind the construction of its first junior high school in generations has been blunted because of Mr. Kim's reckless statements. While Mr. Kim attempts to hide behind his claim of "accountability," we find his argument unpersuasive given the fact that he has been advised that his statements about Principal Narcisse are false.

Further, the District is required by law to protect its employees from discriminatory acts, harassment, and bullying. 42 U.S.C. §§2000e-2(a)(1) and 2000e-3(a); § 24-34-402(1)(a)(I) and (e)(IV), C.R.S. (2024). As a school district, Title VI further obligates the District to protect its employees from discrimination on the basis of race, color, and national origin. 42 U.S.C §§ 2000d - 2000d-7. In Colorado, employers can be held responsible for the discriminatory and harassing conduct of non-employees if the employer knew or should have known of the harassment. *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1073 (10th Cir. 1998).

It is not lost on the Board that Mr. Kim has targeted the District's first Black female principal with false allegations of financial mismanagement. It also is not lost on the Board that Mr. Kim refuses to correct his public accusations against Principal Narcisse after he was given additional information



EXHIBIT

5

about the financial audit. The District has received complaints from other women of color against Mr. Kim about his denigrating conduct and discriminatory treatment of women of color.

Case in point is his conduct toward Board Director Lucy Molina. After Mr. Kim posted on social media about Principal Narcisse, Dir. Molina reached out to Mr. Kim via text message and objected to his conduct toward Principal Narcisse. Mr. Kim's counsel provided excerpts of the conversation. The text messages reveal Mr. Kim cursing at Dir. Molina while trying to hide behind accountability.

This text message conversation then led to Mr. Kim's confrontation with Dir. Molina at the DAC meeting. From what the evidence indicates, Dir. Molina arrived at the DAC meeting and was having a conversation with the DAC Chair before the start of the meeting. From what was alleged, Mr. Kim walked into the DAC meeting, pointed his finger at Dir. Molina, and advanced upon her in such a manner that it caused Dir. Molina concern for her safety. At some point, Mr. Kim left the room and came back in, which was when Dir. Molina started her Facebook Live video.[1]

Any reasonable person viewing the video can see that Dir. Molina was shaken by the initial encounter with Mr. Kim. She recounted the initial encounter, repeated that Mr. Kim targets women of color, and expressed concern for her safety to the point she advised that she would call law enforcement if Mr. Kim did not leave the DAC meeting, which he ultimately did. Many of the witness statements provided by Mr. Kim fail to mention the initial encounter between the two individuals. Instead, witness statements focus on what Dir. Molina said during the Facebook Live recording. One witness, the Chair of the DAC, was present during the initial encounter between Mr. Kim and Dir. Molina. She claims that Dir. Molina was verbally aggressive with Mr. Kim. She confirms that Dir. Molina told Mr. Kim that he was a racist against women of color. In fact, a majority of the witness statement support that Dir. Molina objected to Mr. Kim's behavior toward women of color.

It does not appear that any of the witnesses knew of the text messages exchanged between Mr. Kim and Dir. Molina. It also does not appear that witnesses, except for the Chair of the DAC, were aware of the false information Mr. Kim was spreading about Principal Narcisse via social media involving the financial audit.

While the Board does not condone Dir. Molina's part in the public confrontation with Mr. Kim at a DAC meeting, Dir. Molina, just like all Colorado school board members, is obligated to uphold federal and Colorado law, including antidiscrimination laws that affect the District's employees. § 22-32-103(1), C.R.S. It is plainly obvious that both in the text message communication and the Facebook Live recording, Dir. Molina was effectuating her obligations.[2]

### *Order*

WHEREFORE, the Adams 14 Board of Education orders as follows:

---

[1] In its own investigation, the District received video from the Eagle Point Recreation Center where the DAC meeting was held. Unfortunately, none of the camera angles captured the initial confrontation.

[2] Mr. Kim's counsel raises allegations against Dir. Molina regarding defamation and defamation per se. The Board will not dignify Mr. Kim's counsel's allegations as it only serves as a diversion from what is relevant to this appeal – Mr. Kim's behavior leading to the Notice.

EXHIBIT

5

PENGAD 800-631-6989

Docusign Envelope ID: 5BFCCDD7-9D0D-4CBF-B789-765180FF24C1

A. Pursuant to the Board's legal obligations, Mr. Kim's refusal to correct his misstatements about Principal Narcisse, his solicitation of others to spread his false statements about Principal Narcisse, and that discrimination and harassment complaints have been received by the District by women of color against Mr. Kim require this Board to find that the superintendent's Notice of Restricted Access to Mr. Kim is consistent with federal and state law.

B. The Board, however, modifies the superintendent's Notice by limiting Mr. Kim's contact with Principal Narcisse and accessing the grounds of the new junior high school for a period of three (3) years. The Board has a right to ensure that Mr. Kim does not interfere with staff, faculty, or students of the new junior high school in the lawful pursuit of educational activities. § 18-9-109(2), C.R.S. The Board also will not tolerate non-employees (i.e. Mr. Kim) targeting District personnel with discriminatory, harassing, or intimidating behavior.

C. This final order does not prohibit Mr. Kim from exercising his right to free speech, freedom of assembly, or freedom to petition the Board for redress of grievances. He still enjoys the same rights as other individuals to file complaints with the Board or petition the Board for redress of grievances. He can still attend DAC meetings, Board meetings, and other District functions except when they are located at the new junior high school.

D. This final order should not be construed to limit any rights or claims Principal Narcisse may have against Mr. Kim or her pursuit of legal recourse should she take those steps against Mr. Kim.

Accordingly, the Board MODIFIES the Notice of Restriction. For a period of three (3) years, Mr. Kim is restricted from contacting Principal Narcisse and accessing the grounds of the new junior high school.

On Behalf of the Adams County School District 14 Board of Education,

Signed by:

*Reneé N. Lovato*

Reneé Lovato, President



Docusign Envelope ID: 5BFCCDD7-9D0D-4CBF-B789-765180FF24C1

## CERTIFICATE OF MAILING

I hereby certify that I have provided a true and correct copy of the following **ORDER** this 19th day of May, 2025, via e-mail addressed to the following:

Robinson & Henry, P.C.
Attn: Nicholas J. Catalano, Esq.
Alexander C. Lowe, Esq.
nicholas.catalano@robinsonandhenry.com
alexander.lowe@robinsonandhenry.com

DocuSigned by:

*Vanessa Quintana*

—5D4B441DD2A54BC...

Vanessa Quintana
Interim Board Secretary

EXHIBIT

5