IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-02505

PLAINTIFF

**YONG GEN KIM, A.K.A. CRAIG KIM**

v.

DEFENDANTS

**ADAMS COUNTY SCHOOL DISTRICT 14; KARLA LORÍA in her capacity as Superintendent of Schools of the Adams County School District 14; RENEÉ LOVATO in her capacity as President of the Adams County School District 14 Board of Education; JANET ESTRADA in her capacity as Vice President of the Adams County School District 14 Board of Education; MARIA ZUBIA in her capacity as Secretary of the Adams County School District 14 Board of Education; JAMES AMADOR in his capacity as Treasurer of the Adams County School District 14 Board of Education; and LUZ MOLINA-AGUAYO A.K.A. LUCY MOLINA in her individual capacity and capacity as Director of the Adams County School District 14 Board of Education.**

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

---

Plaintiff Yong Gen Kim a.k.a. Craig Kim, by and through his attorneys at Robinson & Henry, P.C., hereby submits his Response to Defendants' Motion to Dismiss, stating as follows:

**ARGUMENT**

*I.  Mr. Kim seeks injunctive relief in claims one through four, and he plausibly alleges municipal liability.*

The Defendants first argue that Defendant Adams County School District 14 ("Adams 14") cannot be held liable for money damages because Mr. Kim has not plausibly alleged an Adams 14 policy or custom that inflicts a constitutional injury. (ECF 25 at *5).

As an initial matter, the Defendants' argument about municipal liability for money damages

has no bearing on Mr. Kim's ability to seek injunctive relief against Adams 14 for the ongoing violations of his constitutional rights. *See, e.g.*, *Schnell v. Chicago*, 407 F.2d 1084, 1086 (7th Cir. 1969) (holding that injunctive relief was available even if there was no municipal policy or custom). As the Seventh Circuit held in *Schnell* in a case concerning injunctive relief:

> From a legal standpoint, it makes no difference whether the plaintiffs' constitutional rights are violated as a result of police behavior which is the product of the active encouragement and direction of their superiors or as a result of the superiors' mere acquiescence in such behavior. In either situation, if the police officials had a duty, as they admittedly had here, to prevent the officers under their direction from committing the acts which are alleged to have occurred during the Convention, they are proper defendants in this action. If the injuries which allegedly predated the filing of the complaint and which allegedly will reoccur at a future time are established at trial, the district court would be warranted in granting some form of the relief requested. The presumption of irreparable harm is manifest here where it is alleged that first amendment rights have been chilled as a result of both government action and inaction. There can be no conclusion but that the complaint sufficiently alleges that constitutionally protected activity was and continues to be interfered with by the named defendants and that the defendants have the duty and power to prevent any future interference. These allegations, if true, would be ground for relief under 42 U.S.C. § 1983.

*Id*. (internal citations omitted). The Defendants cite *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978), for the proposition that public entities like Adams 14 are not liable for every constitutional violation by its officers or employees. However, the decision in *Monell* concerned money damages, not injunctive relief. *Id*. at 660 (injunctive relief previously held moot). At the very least, Mr. Kim is entitled to injunctive relief against Adams 14, because he remains banned from contacting Tiffany Narcisse and from accessing the grounds of the new junior high school where Ms. Narcisse is principal. (ECF 15 ¶¶ 49, 53).

Nevertheless, Mr. Kim also plausibly alleges the municipal liability of Adams 14 for money damages. The Defendants try to ignore pertinent allegations in the Amended Complaint by focusing solely on paragraph 96, but the Adams 14 policy or custom at play was described in several paragraphs throughout the Amended Complaint. Moreover, the policy or custom was orchestrated and applied by the highest authority figures in Adams 14: its Board of Education, its Superintendent

of Schools Dr. Loría, and its chief legal counsel Joseph Salazar.

First, Defendant Lucy Molina, a Board member and the Adams 14 Director, (ECF 15 ¶ 9), harassed Mr. Kim and prohibited him from exercising his First Amendment rights on the basis of his race and sex, (*id*. at ¶¶ 22-30, 47). The Defendants cite *Bender v. Williamsport Area School District*, 475 U.S. 534, 545 (1986), for the proposition that the actions of a single Board member are insufficient to show a municipal policy or custom, but that is not what *Bender* says at all. *Bender* merely held that a single board member could not appeal a court decision that the full board had declined to appeal, explaining:

> Mr. Youngman's status as a School Board member does not permit him to 'step into the shoes of the Board' and invoke its right to appeal. In this case, Mr. Youngman was apparently the lone dissenter in a decision by the other eight members of the School Board to forgo an appeal. Generally speaking, members of collegial bodies do not have standing to perfect an appeal the body itself has declined to take.

*Id*. at 544-45 (internal citation omitted). That uncontroversial holding has nothing to do with whether the actions of a single Board member are sufficient to show a policy or custom for purposes of municipal liability.

After Ms. Molina harassed Mr. Kim and prohibited him from exercising his First Amendment rights, what did the Defendants do? No apology; rather, Mr. Salazar, Dr. Loría, and the Board further threatened and punished Mr. Kim. (Exhibit 2 to ECF 15; Exhibit 3 to ECF 15; Exhibit 5 to ECF 15). These further actions by the Defendants are more fully described *infra* in Part II.A. Ultimately, the Board upheld and modified Mr. Kim's punishment in its May 19 order. Regarding the May 19 order, the Defendants attempt to argue that a single unconstitutional incident is ordinarily insufficient for municipal liability. However, we are not dealing with just a single incident here. The May 19 order is the last incident in a string of connected incidents that started with the harassment by Ms. Molina. Indeed, in issuing its May 19 order that was attached to and incorporated into the Amended Complaint as Exhibit 5, the Board noted as follows:

3

> While the Board does not condone Dir. Molina's part in the public confrontation with Mr. Kim at a DAC meeting, Dir. Molina, just like all Colorado school board members, is obligated to uphold federal and Colorado law, including antidiscrimination laws that affect the District's employees. § 22-32-103(1), C.R.S. It is plainly obvious that both in the text message communication and the Facebook Live recording, Dir. Molina was effectuating her obligations.[2]

(Exhibit 5 to ECF 15 at *7). This is quite shocking, because Ms. Molina's text message communications, which the Board explicitly says are examples of Ms. Molina effectuating her legal obligations as Director and a Board member, included the following:



4



**Lucy Molina**
Machistas ALWAYS picking on women
6:11 PM
Read

**Me**
So you're going to attack me because I am bringing it up actual facts? That is fucked up Lucy
6:11 PM
Read

**Lucy Molina**
that's Soo manly
6:11 PM
Read

**Lucy Molina**
Too bad
6:12 PM
Read

**Lucy Molina**
😳
6:12 PM
Read

**Me**
So now you're going to bring up it's a masculinity thing. Dude, this is not about gender like you are trying to make this out to be. This is about what is right and what is wrong. It's about ethics it's not about someone's race gender it's just strictly about their experience
6:12 PM
Read

**Lucy Molina**
So disrespectful
6:12 PM
Read

**Lucy Molina**
Dude
6:12 PM
Read

5



(ECF 15 ¶ 23, explicitly dismissing Mr. Kim's criticism based on his sex, and referring to Mr. Kim as a "vato" and "machista" in a derogatory manner).

But the vitriol did not end there. The harassing text messages Ms. Molina sent to Mr. Kim, which were specifically referenced in the Amended Complaint, (ECF 15 ¶ 22-23), and which, again, the Board says are examples of Ms. Molina effectuating her legal obligations, also included the following:



6



The Board also says the Facebook Live recording was an example of Ms. Molina effectuating her legal obligations. Again, this is quite shocking. The video Ms. Molina recorded of herself berating Mr. Kim and defaming him, which was specifically referenced in the Amended Complaint, (ECF 15 ¶ 25), is available for the Court to view. Plaintiff encourages the Court to view the video to get a more complete sense of the discriminatory animus Ms. Molina displayed toward Mr. Kim. This animus, according to the explicit language of the Board's May 19 order, is just Ms. Molina doing her job.

Finally, the Defendants argue that the May 19 order does not actually restrict Mr. Kim's ability to speak. This is simply not true. As alleged in the Amended Complaint:

> The May 19 order modified the ban against Mr. Kim by now restricting Mr. Kim from contacting Ms. Narcisse and from accessing the grounds of the new junior high school where Ms. Narcisse is principal for a period of three (3) years.
> ….
> In the May 19 order, the Board stated that Mr. Kim would not be able to attend future DAC meetings, Board meetings, and other District functions when those functions are located at the new junior high school where Ms. Narcisse is principal. District functions such as these are normally open to the general public, so Mr. Kim's freedom of speech, his freedom of assembly, and his freedom to petition the government for a redress of grievances are impacted by the current ban outlined in the May 19 order.

(ECF 15 ¶¶ 49, 53; *see also* Exhibit 5 to ECF 15 at *8). The Defendants' characterization of the restrictions they imposed against Mr. Kim as being no restrictions at all is simply dishonest, and defense counsel's repetition of that argument is lacking in due candor.

Overall, in viewing the Amended Complaint and the attached exhibits as a whole, Mr. Kim plausibly alleges a municipal policy or custom to render Adams 14 liable for money damages.

As for the Defendants' argument about Mr. Kim's direct claims under the U.S. Constitution as opposed to 42 U.C.S. § 1983, defense counsel did not confer with undersigned counsel on this issue. D.C.COLO.LCivR 7.1 states that:

> Before filing a motion, counsel for the moving party or an unrepresented party shall confer or make reasonable, good faith efforts to confer with any opposing counsel or unrepresented party to resolve any disputed matter. The moving party shall describe in the motion, or in a certificate attached to the motion, the specific efforts to fulfill this duty.

Contrary to the certificate of conferral, at no point during conferral on the Motion did defense counsel say they would be making an argument regarding direct claims under the U.S. Constitution. For that reason alone, the Court should reject that argument.

### II.A   Mr. Kim plausibly alleged a compelled speech claim.

"In order to make out a valid compelled-speech claim, a party must establish (1) speech; (2) to which he objects; that is (3) compelled by some governmental action." *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015). Mr. Kim easily satisfies all three of these elements.

The Defendants focus on the third element in arguing that their actions were not coercive, but the Defendants' argument is undercut by the very cases they cite. As the Tenth Circuit explained in *Cressman*, "[i]n order to compel the exercise or suppression of speech, the government measure must punish, or threaten to punish, protected speech by governmental action that is regulatory, proscriptive, or compulsory in nature." 798 F.3d at 951 (internal quotation marks omitted). The full range of actionable conduct described in *Cressman*—both punishment and threats of future

8

punishment—is broad enough that the Defendants did not need to explicitly demand that Mr. Kim retract his prior statements for their actions to be coercive. *Id*. Rather, it is sufficient that the Defendants explicitly punished Mr. Kim for his speech by proscriptive government action banning him from District property. *Id*. Nor was it necessary for the Defendants to compel Mr. Kim to make affirmative statements at all, because it is also sufficient that they compelled him to remain silent. *Id*. ("In order to compel the exercise or suppression of speech…").

In any event, the Defendants did demand that Mr. Kim make retractions, at least implicitly, and they explicitly demanded, under threat of future punishment, that he cease making the statements they wanted retracted (i.e., suppression). First, Ms. Molina threatened to call police unless Mr. Kim left the DAC meeting on April 16, 2025. (ECF 15 ¶¶ 26-29). Then, on April 19, 2025, the Defendants' chief legal counsel Joseph Salazar sent a threatening letter to Mr. Kim, attached to and incorporated into the Amended Complaint as Exhibit 2, in which Mr. Salazar stated:

> As a member of the public, you have the right to attend DAC meeting within the parameters of the law. That means you do not have the right to violate the rights of our Board members, superintendent, or employees. As there are concerns that your attack on our new principal may be race- and sex-based, our obligation to protect Adams 14 personnel includes ensuring that you do not retaliate against anyone for objecting to your behavior. Any further action by you that violates the rights of others, such as creating a hostile environment, will be met by expulsion from District property.

(ECF 15 ¶¶ 31-34; Exhibit 2 to ECF 15, at *2). Mr. Salazar threatened that further speech by Mr. Kim would be met with expulsion. (*Id*.) And the Defendants followed through on their threat.

On April 28, 2025, Defendant Dr. Karla Loría sent Mr. Kim another letter, attached to and incorporated into the Amended Complaint as Exhibit 3, informing Mr. Kim that he was banned from District property for three years. (ECF 15 ¶ 35). The letter from Dr. Loría referenced the previous letter from Mr. Salazar, stating:

> Despite receiving Mr. Salazar's letter, which notified you of your misstatements and provided context to information you have spread throughout community, you continue to engage in your reckless disregard of the truth.

9

(Exhibit 3 to ECF 15, at *1).

Mr. Kim appealed the decision banning him from District property, and the Board doubled down on punishing Mr. Kim in dispensing with his appeal. (ECF 15 ¶¶ 45, 48-49). The Board did so in a May 19, 2025, order. (*Id*. at ¶ 49). In the May 19 order, the Board explicitly noted that its decision to punish Mr. Kim was based in part on "Mr. Kim's refusal to correct his misstatements about Principal Narcisse." (Exhibit 5 to ECF 15, at *8, ¶ A). The Board also made several other statements indicating that its decision to punish Mr. Kim was based in part on his refusal to issue retractions:

> "What is particularly troubling is that after Mr. Kim was advised his statements were false and misleading, he still refuses to make any public corrections on social media."
> ….
> "Every day he fails to correct his misstatement is another day Principal Narcisse's reputation is harmed in the community."
> ….
> "While Mr. Kim attempts to hide behind his claim of 'accountability,' we find his argument unpersuasive given the fact that he has been advised that his statements about Principal Narcisse are false."
> ….
> "It also is not lost on the Board that Mr. Kim refuses to correct his public accusations against Principal Narcisse after he was given additional information about the financial audit."

(*Id*. at *6-7; ECF 15 ¶¶ 63-64).

Clearly, the Defendants threatened to ban Mr. Kim from District property based on his speech, and when Mr. Kim did not issue retractions of his prior statements, the Defendants followed through on their threat and banned him. Under *Cressman*, those actions easily constitute coercion. 798 F.3d at 951 ("In order to compel the exercise or suppression of speech, the government measure must punish, or threaten to punish, protected speech by governmental action that is regulatory, proscriptive, or compulsory in nature.").

Astonishingly, the Defendants argue as follows: "that Mr. Kim has never retracted or modified his statements establishes he was not forced or compelled to do so by the Board." (ECF 25

10

at *8). This argument completely ignores the fact that Mr. Kim was punished by the Defendants for refusing to make such retractions. (Exhibit 5 to ECF 15 at *6-8; ECF 15 ¶¶ 63-64). By the Defendants' apparent logic, government entities may punish individuals for refusing to say what the government wants them to, but as long as the government does not (somehow) forcibly cause someone to expel favored words from their mouth, it is not compelled speech. *Cressman*, and common sense, dictate otherwise. 798 F.3d at 951 ("In order to compel the exercise or suppression of speech, the government measure must *punish*, or threaten to punish, protected speech by governmental action that is regulatory, proscriptive, or compulsory in nature.") (emphasis supplied).

Finally, the Defendants again argue that the May 19 order "invites Mr. Kim to continue exercising his right to free speech, saying he may still file complaints with the Board and petition the Board for redress of grievances." (ECF 25 at *8-9). This is gaslighting, because Mr. Kim remains banned from contacting Tiffany Narcisse and from accessing the grounds of the new junior high school where Ms. Narcisse is principal. (ECF 15 ¶¶ 49, 53). The Defendants readily admit that they banned Mr. Kim from District property based on his speech, a clear violation of the First Amendment, but then tell him "It's okay, it's not that bad, you still can file complaints with the Board." The First Amendment does not tolerate punishing individuals for their protected speech, regardless of the severity of the punishment. A First Amendment violation does not cease to exist simply because, in the opinion of the violator, it was not that bad.

Mr. Kim has clearly alleged a compelled speech claim.

### II.B   *Mr. Kim plausibly alleged claims for violations of equal protection under the law.*

The Defendants next argue that Mr. Kim does not plausibly allege that the Defendants discriminated against him on the basis of race and sex. The Defendants make this argument while ignoring pertinent allegations that amply demonstrate discriminatory animus toward Mr. Kim, as well as by ignoring allegations that the Defendants' attempted to insulate Ms. Narcisse from valid

11

criticism by repeatedly referencing that she is a woman of color.

Despite the fact that Mr. Kim's criticism of Ms. Narcisse was race-neutral and sex-neutral, (ECF 15 ¶ 13; Exhibit 1 to ECF 15), the Defendants discounted and punished that criticism because Mr. Kim is not a woman of color. Indeed, in Defendant Lucy Molina's communications with Mr. Kim, Ms. Molina clearly displayed discriminatory animus against men, and particularly white men. This harassment is more fully discussed *supra* in Part I.

Ms. Molina's discriminatory harassment of Mr. Kim continued the next day at the April 16, 2025, DAC meeting. (ECF 15 ¶¶ 24-25, 47). Indeed, Ms. Molina is on video—that she herself recorded and then deleted—berating Mr. Kim at the DAC meeting, again repeatedly referring to Mr. Kim in a derogatory manner as an "entitled man" and a "vato," "machista," and "chavala," etc. (*Id*.) Even though Mr. Kim himself is not even white, Ms. Molina also referred to Mr. Kim as a white man in a derogatory manner. (ECF 15 ¶ 47). Ms. Molina's vitriolic statements culminated in falsely accusing Mr. Kim of physically attacking her and other women of color and threatening to call police, despite having no knowledge whatsoever of Mr. Kim physically attacking anyone. (ECF 15 ¶¶ 26-27).

But what did the other Defendants do in the wake of Ms. Molina's ridiculous statements? Mr. Salazar, Dr. Loría, and the Board continued to threaten and then punish Mr. Kim. (Exhibit 2 to ECF 15; Exhibit 3 to ECF 15; Exhibit 5 to ECF 15). Furthermore, the Defendants repeatedly referenced Ms. Narcisse's race and sex in an attempt to insulate her from Mr. Kim's criticism. (ECF 15 ¶ 35-38). As undersigned counsel stated in Mr. Kim's appeal letter that was attached to and incorporated into the Amended Complaint as Exhibit 4:

> Women of color, like Ms. Molina and Ms. Narcisse, are entitled to all the same rights and privileges as everyone else in this country. But they are not above criticism or disagreement. Mr. Kim has voiced his concerns without ever making it about anyone's race or sex, or any other personal trait. It is unconscionable for Ms. Molina, Dr. Loría, and the Board to do the opposite and baselessly accuse Mr. Kim of racism and sexism because he has the gall to disagree with them. In short, it is a weaponization of race and sex. It is a slap in the face to every person who deals with real racism or real sexism, and false accusations like these undermine the credibility of those who fight to eliminate real racism and real sexism.

(Exhibit 4 to ECF 15 at *10). It is clear from all the communications received from the Defendants that, were Mr. Kim a woman of color, the exact language he used in questioning Ms. Narcisse's qualifications would have been received quite differently. But because he is, in the words of Ms. Molina, an "evil entitled man" and a "white [sic] man," his criticism was immediately dismissed as racist and sexist and subsequently punished by Dr. Loría and the rest of the Board.

Mr. Kim has clearly alleged that he faced discriminatory animus from the Defendants because of his race and sex.

### IV.     Defense counsel failed to confer about qualified immunity, and Ms. Molina is not entitled to qualified immunity.

Again, contrary to the certificate of conferral, at no point during conferral on the Motion did defense counsel say they would be making an argument based on qualified immunity. For that reason alone, the Court should reject the qualified immunity argument.

In any event, the Defendants' argument is an attempt to minimize Ms. Molina's actions. The Defendants argue that "accusing someone of being racist or sexist is not a constitutional violation." But that is not all Ms. Molina did. After harassing Mr. Kim, Ms. Molina threatened to call police in order to force Mr. Kim to leave the April 16, 2025, DAC meeting and thereby prevent Mr. Kim from exercising his First Amendment rights at the DAC meeting. (ECF 15 ¶¶ 26-30). She made false accusations in order to force Mr. Kim to leave the DAC meeting, and according to the Defendants, she did so in her capacity as a Board member.

Ms. Molina violated Mr. Kim's rights to freedom of speech, freedom of assembly, freedom

13

to petition the government for a redress of grievances, and equal protection under the law. These rights are specifically enshrined in the First and Fourteenth Amendments to the U.S. Constitution. Furthermore, countless cases have reaffirmed the principle that "the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). And "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id*. at 829. Ms. Molina did not like Mr. Kim's speech, nor did she like his race and sex, so she took action to ban Mr. Kim from speaking.

Indeed, a remarkably similar case to this one is *Pryor v. School District Number 1*, 99 F.4th 1243 (10th Cir. 2024). The facts in *Pryor* were as follows:

> Plaintiff Brandon Pryor passionately—and at times profanely—criticized actors within Defendant Denver School District No. 1 ("District") when he advocated for change within the District. In response, Defendants stripped him of his volunteer position and restricted his access to District facilities.

99 F.4th at 1248. In holding that the plaintiff was entitled to a preliminary injunction, the Tenth Circuit noted as follows:

> Defendants fail to show that their interest in enforcing the Restrictions outweighs Plaintiff's interest in speaking. Moreover, Defendants' failure to enforce restrictions after prior complaints, engage in conflict resolution or mediation, or make any other effort to protect its employees contradicts any assertion that they have a significant interest in enforcing the Restrictions. Defendants' testimony that Plaintiff threatens their reputations suggests that Defendants' interest lies in curbing an expected public reaction. This does not weigh in their favor because the District lacks a valid interest in avoiding embarrassment or irritation at the expense of community members' free speech rights.

*Id*. at 1253. This is the same invalid excuse the Defendants trotted out in this case. In her April 28, 2025, letter banning Mr. Kim from all District property, Dr. Loría stated:

> In particular, you were advised that we received complaints about your pattern and practice of targeting women of color in this district through your harassing and bullying conduct. We also reviewed your email to the Adams 14 Board of Education, which contains misstatements about our newly hired principal, who happens to be a Black woman, concerning her prior employment. We further considered your campaign to elicit the help of the Chair of the District Accountability Committee ("DAC") to spread this misinformation about our principal. As recently as Monday, April 21, 2025, other community members joined with you to continue the public spread of misinformation. In sum, you have targeted a Black female principal through a campaign of misinformation, which has resulted in harm to her reputation and is affecting her ability to lead the District's brand-new junior high school.

(Exhibit 3 to ECF 15 at *1). And in modifying the punishment via the May 19 order, the Board again indicated that Mr. Kim was banned in an attempt to save face with the community:

> Thus, Mr. Kim, who is the root of misinformation concerning the financial audit, has allowed a false narrative about Principal Narcisse to spread through the community without accepting any responsibility for his acts. Every day he fails to correct his misstatement is another day Principal Narcisse's reputation is harmed in the community. We recognize the guidance of the Tenth Circuit Court of Appeals where it was held that false statements causing a legally cognizable harm are not entitled to First Amendment protections. *Animal Legal Defense Fund v. Kelly*, 9 F.4th 1219, 1232 (10th Cir. 2021). By virtue of the harm to Principal Narcisse, the District also is harmed as the celebration and community joy behind the construction of its first junior high school in generations has been blunted because of Mr. Kim's reckless statements. While Mr. Kim attempts to hide behind his claim of "accountability," we find his argument unpersuasive given the fact that he has been advised that his statements about Principal Narcisse are false.

(Exhibit 5 to ECF 15 at *6).

Ms. Molina is not entitled to qualified immunity.

### V.B. *Ms. Molina's actions were willful and wanton.*

In arguing that Ms. Molina's actions were not willful and wanton, the Defendants again attempt to minimize what she did. Particularly the following the characterization: "That she and Mr. Kim viewed his conduct differently and expressed that in saying she and other women of color felt attacked does not show a conscious disregard for the truth or for any potential harm. On the contrary, it is her right to express her feelings on the matter." (ECF 25 at *16). Nothing could be further from reality. Ms. Molina did not just express her feelings that she felt verbally attacked—she falsely accused Mr. Kim of "physically" attacking her and other women of color and then threatened to call police. As explained at length in the Amended Complaint, Ms. Molina berated Mr. Kim,

15

trying to get a reaction out of him. (ECF 15 ¶¶ 25, 47, 56-58).

> One parent of a district student said:
>
> > From where I was sitting in the meeting room I was facing the door that Craig Kim entered into the room. I noticed him in the hallway speaking with some older kids and he seemed to be in a positive upbeat mood. The very second, he entered the meeting room Lucy Molina begin to raise her voice and made a statement, here comes that white man[3] that likes to go around attacking women of color. I heard Craig respond with something like that was not the reason he was at this meeting and not the place for this discussion. She continued to be loud and say things like how entitled white men can hate on women of color. Craig sat down and was ignoring her ridiculous outburst and speaking with a couple of the high school girls that were also attending the meeting. In my opinion the more Craig tried to ignore Lucy the louder she thought she needed to be. Making derogatory statements in
> >
> > Spanish and even referring to him as a "vato". I heard her mention that she was either going live or maybe she was already live and continued with the derogatory statements in Spanish. I feel the meeting continued to proceed in its best efforts not to feed into the ridiculous behavior being caused by Lucy Molina. The meeting was moving forward with its ice breaker of introductions. When it was time for Lucy's turn her tone became very aggressive and she started saying she was feeling threatened by Craig Kim. I was so confused as to me she seemed to be the one acting as the aggressor. She accused him of attacking women of color in the city and requested he be removed from the meeting. Even making remarks as to calling the police. I feel that Lucy Molina used her position as a school board member to bully and threaten Craig Kim. I also feel that she falsely used certain verbiage to continue her attack against Craig Kim. If I am being completely honest Lucy Molina's behavior was making me feel very unsafe. She was coming across very confrontational and telling her "live" audience to come on down to the DAC meeting. She made me feel like she was trying to cause more bull[y]ing [sic] and even create physical altercations. Craig Kim handled himself in a respectful professional manor. Whereas Lucy Molina left me with an impression of someone who takes pride in adult bullying.

(*Id.* at ¶ 47). And despite claiming to feel threatened by Mr. Kim, Ms. Molina did not actually call the police. Instead, she continued to berate him on video (selfie style) for several minutes while sitting near him and doing her hair. (*Id.* at ¶ 57).

Undersigned counsel can only do so much in attempting to describe Ms. Molina's actions. Luckily, it is all on video. It is abundantly clear from watching the video Ms. Molina recorded of herself and livestreamed on Facebook that her accusations of Mr. Kim physically attacking her and

16

other women of color were pretextual and performative in order to prevent Mr. Kim from further questioning Ms. Narcisse's qualifications. Again, Plaintiff encourages the Court to view the video to get a more complete sense of Ms. Molina's willful and wanton conduct.

WHEREFORE, Plaintiff Yong Gen Kim a.k.a. Craig Kim respectfully requests that the Motion to Dismiss be denied.

Respectfully submitted this 28th day of October, 2025.

ROBINSON & HENRY, P.C.

By:  /s/ Nicholas J. Catalano
Alexander Lowe, #36827
Nicholas J. Catalano, # 53787
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

      This is to certify that on October 28th, 2025, a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS** was filed with the US District Court of Colorado and emailed and mailed to the following:

CAPLAN AND EARNEST LLC
Michael Schreiner
Gwyneth Whalen
Zoe Verhoeven
3107 Iris Avenue, Suite 100
Boulder, CO 80301
mschreiner@celaw.com
gwhalen@celaw.com
zverhoeven@celaw.com
*Attorneys for Defendants*

                                          **ROBINSON & HENRY, P.C.**

      By:    */s/ Emily Tebbs*
                Emily Tebbs | Senior Paralegal